**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INDEPENDENT TRUST CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 5749 |
| | ) | |
| FIDELITY NATIONAL TITLE INSURANCE | ) | Judge Rebecca R. Pallmeyer |
| COMPANY OF NEW YORK, a New York | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Until 2000, Plaintiff Independent Trust Corporation ("Plaintiff"), an Illinois corporation, served as a trustee for nearly 20,000 trust accounts primarily consisting of individual retirement accounts, which were valued at over $1 billion. (Compl. ¶ 12.)[1] In order to invest and manage these trust accounts, Plaintiff entered into an escrow agreement with Intercounty Title Company of Illinois ("Old Intercounty") in 1990. (*Id.* ¶ 20.) In 2000, Defendant Fidelity National Title Insurance Company of New York ("Defendant"), a New York corporation, took control of the escrow account where Old Intercounty was storing Plaintiff's funds. (*Id.* ¶ 19.) This suit arises out of the alleged misappropriation by Fidelity of $68 million in escrow funds that Plaintiff deposited with Old Intercounty before the Illinois Commissioner of Banks and Real Estate ("the Commissioner") placed Plaintiff in receivership for the purpose of liquidation in April 2000 after the discovery of the $68 million loss.

Plaintiff's receiver, PricewaterhouseCoopers LLP ("PWC"), brings this action on behalf of Plaintiff and for the benefit of the almost 20,000 account holders that Plaintiff claims have borne the loss of the misappropriated escrow funds. (*Id.* ¶¶ 114, 128.) Plaintiff sues Defendant for breach of contract (Count I), breach of fiduciary duty (Count II), fraud (Count III), fraudulent concealment

_____

[1] All citations to "Compl." refer to Plaintiff's Amended Complaint filed on June 30, 2006.

(Count IV), violation of the Illinois Consumer Fraud and Deceptive Business Practice Act (Count V), conversion (Count VI), violation of the Illinois Title Insurance Act (Count VII), fraudulent transfers pursuant to 740 ILCS 160/5(a)(1) of the Illinois Uniform Fraudulent Transfer Act ("IUFTA") (Count VIII), fraudulent transfers pursuant to 740 ILCS 160/6 of the IUFTA (Count IX), fraudulent transfers pursuant to 740 ILCS 160/5(a)(2) of the IUFTA (Count X), and unjust enrichment (Count XI). Defendant has moved to dismiss Plaintiff's complaint on the bases that Counts II through XI are barred by the statute of limitations, and that Plaintiff has failed to state claims for breach of contract, breach of fiduciary duty, fraudulent concealment, fraud, conversion, violation of the Illinois Title Insurance Act, or fraudulent transfers under the IUFTA. For the reasons set forth below, Defendant's motion to dismiss is denied in part and granted in part.

## BACKGROUND

The following facts, drawn from the complaint, are accepted as true for the purpose of this motion to dismiss. *Shawnee Trail Conservancy v. U.S. Dep't of Agric.*, 222 F.3d 383, 385 (7th Cir. 2000).

### 1.    The Parties & Their Relationships With Relevant Entities

Jack Hargrove ("Hargrove") was Plaintiff's owner and the Chairman of Plaintiff's board. (Compl. ¶ 14.) Laurence Capriotti ("Capriotti") was one of Plaintiff's directors. (*Id.*) In this action, Plaintiff claims that Hargrove and Capriotti caused it to transfer tens of millions of dollars in trust holder funds to other entities they controlled—Old Intercounty and Old Intercounty's parent company, ITI Enterprises, Inc. ("ITI")—pursuant to an escrow arrangement. Plaintiff alleges that Hargrove, Capriotti, and Old Intercounty/ITI[2] then converted millions of dollars of Plaintiff's escrow

---

[2]    According to Plaintiff, from 1994 until at least 2000, Hargrove and Capriotti were operating Old Intercounty and ITI without distinguishing the entities so as to make it difficult to determine when the two entities were acting in concert or which entity was acting on its own; in these situations, Plaintiff refers to Old Intercounty and ITI as "Old Intercounty/ITI" and the court follows Plaintiff's approach. (Compl. ¶¶ 16, 88.)

funds to their own use. (*Id.* ¶1.) As a result of the fact that $68 million in Plaintiff's escrow funds could not be accounted for, on April 14, 2000, the Illinois Commissioner of Banks and Real Estate ("the Commissioner") took control of Plaintiff and appointed PWC as its receiver for the purpose of liquidating Plaintiff;[3] as receiver, PWC was authorized to take all measures to "protect, preserve, collect and recover" Plaintiff's assets, property, debts, and claims, and to prosecute or defend suits relating to Plaintiff's affairs, assets, or debts. (*Id.* ¶ 13.)

Hargrove and Capriotti also owned ITI. (*Id.* ¶ 15.) Beginning in 1994, ITI owned Old Intercounty,[4] a corporation that issued title insurance policies and provided real estate closing services, including escrow services. (*Id.*) Capriotti was President of Old Intercounty and Hargrove served as its Secretary. (*Id.*)

In 1995, another corporation, New Intercounty, began operating to provide real estate closing services, including escrow services, "primarily with respect to title policies underwritten by" yet another similarly-named entity, Intercounty National Title Insurance Company ("Intercounty National"). (*Id.* ¶ 17.) Intercounty National was authorized to act as a title insurance underwriter in Illinois. (*Id.*) From 1995 to April 26, 2000, whenever New Intercounty purportedly provided escrow services to residential and commercial real estate customers, the services were actually provided by Old Intercounty/ITI under a service agreement between New Intercounty and ITI. (*Id.*)

Defendant, a New York corporation, underwrites title insurance and reinsures title insurance underwritten by other companies. (*Id.* ¶ 18.) Pursuant to a reinsurance agreement between Defendant and Intercounty National, from 1995 to 2000, Intercounty National served as Defendant's

---

[3]     The Illinois Corporate Fiduciary Act, 205 ILCS 620/6-1 *et seq.,* authorizes the Commissioner to place a corporate fiduciary in receivership for a number of reasons, including if its capital is impaired, if business is being conducted in an unlawful manner, or if it is unable to continue operations. 205 ILCS 620/6-2. The complaint does not indicate the Commissioner's particular reason for placing Plaintiff in receivership.

[4]     As of August 1, 1997, Old Intercounty changed its name to Wholesale Real Estate Services. (Compl. ¶ 15.)

agent in Chicago, Illinois, and Defendant served as a reinsurer for title insurance policies underwritten by Intercounty National. (*Id.*) "Among other things, [Defendant] reinsured [Intercounty National] against loss in its title policies in excess of [Intercounty National's] primary retention." (*Id.*) According to Plaintiff, as a result of New Intercounty's relationship with Intercounty National whereby New Intercounty provided escrow services with respect to title policies underwritten by Intercounty National, Defendant was obligated to insure Intercounty National against the loss of any escrow funds deposited with New Intercounty. (*Id.*)

For reasons described in greater detail below, on April 26, 2000, Defendant took control of the escrow accounts that Old Intercounty/ITI had previously managed. (*Id.* ¶ 19.) Old Intercounty/ITI, New Intercounty, and Intercounty National granted Defendant "the authority to control, monitor and oversee all aspects and functions of Intercounty's Escrow Account." (*Id.*) As a result of Defendant's informing the Illinois Department of Financial Institutions ("DFI") of a shortfall in the Old Intercounty/ITI escrow account and its intention to cancel its reinsurance agreement with Intercounty National, on June 26, 2000, the DFI appointed Defendant trustee of Intercounty National "with the authority to assure the proper disbursement and distribution of all escrowed funds held by [Intercounty National] or its agents." (*Id.*)

### 2. Old Intercounty/ITI's Service as Escrow Agent to Plaintiff and New Intercounty/Intercounty National

In December 1990, Hargrove and Capriotti caused Plaintiff to enter into an escrow agreement with Old Intercounty, the purpose of which was "to serve as an investment vehicle for the daily cash investment and management of" Plaintiff's retirement plan accounts and other trust accounts. (*Id.* ¶ 20.) Under the agreement, Plaintiff promised to deposit funds with Old Intercounty, and Old Intercounty promised to hold Plaintiff's funds in an interest-bearing account. (*Id.*) The agreement further stated that Plaintiff could deposit and had sole authority to withdraw funds on a daily basis and from time to time upon its sole order to Old Intercounty; withdrawals of funds were

4

to be executed by Plaintiff's written direction to Old Intercounty or over the telephone. (*Id.*) Funds withdrawn from the escrow account were to be transferred to another particular account belonging to Plaintiff at Northern Trust Bank. (*Id.*) Although this escrow agreement was between Plaintiff and Old Intercounty, Plaintiff alleges that Plaintiff's escrow account was in fact managed by both Old Intercounty and ITI, and that Plaintiff received statements and communications concerning its escrow funds from both Old Intercounty and ITI. (*Id.* ¶ 21.) Plaintiff therefore alleges that it would "sanction a fraud and promote an injustice to observe the fiction of separate corporate existences for Old Intercounty and ITI" and that "ITI had the same obligations to [Plaintiff] pursuant to the escrow agreement as did Old Intercounty." (*Id.* ¶ 88.) Plaintiff alleges that it fully performed its obligations under the escrow agreement. (*Id.* ¶ 89.)

Initially, when Plaintiff transferred trust holder funds to Old Intercounty/ITI pursuant to the escrow agreement, the funds were deposited into a particular escrow account with LaSalle National Bank in the name of "Intercounty Title Company" ("2728 LaSalle Account"); the account was controlled by Old Intercounty/ITI. (*Id.* ¶ 22.) Based on the history of Plaintiff's deposits, withdrawals, and interest earnings for this account, Plaintiff claims that by the end of 1994, the balance of funds on deposit with Old Intercounty/ITI should have been over $33 million. (*Id.*)

On October 5, 1995, Old Intercounty/ITI opened another escrow account at LaSalle National bank in the name of "Intercounty Title Company" ("7427 LaSalle Account"). (*Id.* ¶ 23.) Some New Intercounty and Intercounty National officers signed the documents necessary to open this account, but only Old Intercounty/ITI employees had check signing authority or otherwise controlled the 7427 LaSalle Account. (*Id.*) Between 1995 and 2000, Plaintiff deposited $29,700,000 in trust holder funds with Old Intercounty/ITI, and Old Intercounty/ITI deposited at least some of those funds in the 7427 LaSalle Account. (*Id.* ¶ 25.) During the same time period, funds that Old Intercounty/ITI managed for New Intercounty/Intercounty National pursuant to the service agreement between those parties were also being deposited in the 7427 LaSalle Account. (*Id.* ¶ 24.) Plaintiff therefore

claims that between 1995 and 2000, New Intercounty/Intercounty National escrow funds were commingled with escrow funds that Old Intercounty/ITI was contractually bound to hold for Plaintiff and its account holders. (*Id.* ¶ 25.)

According to Plaintiff, sometime in late 1996 or early 1997, Plaintiff and regulators from the Illinois Office of Banks and Real Estate ("OBRE") pressured Old Intercounty/ITI to set up an escrow account at LaSalle Bank that would be limited to holding Plaintiff's trust holder funds. ("LaSalle Segregated Account"). (*Id.* ¶ 26.) Old Intercounty/ITI represented to Plaintiff and OBRE that it had complied with this direction and had placed Plaintiff's funds, which Plaintiff alleges should have exceeded $54 million by 1997, into the LaSalle Segregated Account. (*Id.*) In reality, however, Old Intercounty/ITI never transferred any significant amount of Plaintiff's escrow funds into the LaSalle Segregated Account, and instead continued to keep virtually all of Plaintiff's escrow funds commingled with New Intercounty/Intercounty National funds. (*Id.*) Old Intercounty/ITI alone controlled the LaSalle Segregated Account; in fact, Plaintiff had no authority to withdraw funds from or verify the balance of any account controlled by Old Intercounty/ITI, segregated or unsegregated. (*Id.*)

In June 1998, Old Intercounty/ITI stopped keeping any balance in the 2728 LaSalle Account; as of June 30, 1998 the balance in that account was $0 and the account never again carried a positive balance. (*Id.* ¶ 27.) But, on June 30, 1998, the balance in the 7427 LaSalle Account was $39,030,779.02. (*Id.*) Thus, Plaintiff alleges, by June 1998 and continuing thereafter, Old Intercounty/ITI had transferred all of Plaintiff's remaining escrow funds into the 7427 LaSalle Account in which New Intercounty/Intercounty National funds were also kept. (*Id.*)

In the fall of 1999, Old Intercounty/ITI closed its accounts at LaSalle Bank and transferred escrow funds to an escrow account at Harris Bank (the "6152 Harris Bank Account") that was in the name of "Intercounty Title Company," and was set up and controlled by Old Intercounty/ITI. (*Id.* ¶ 28.) Just before the 7427 LaSalle Account was closed, it contained a balance of $32,726,799.47.

(*Id.*) By September 30, 1999, the balance in that account shrunk to $1,321,667.59, and the account had no balance after that September. (*Id.*) Meanwhile, as of September 30, 1999, the 6152 Harris Account had a balance of $29,956,800.29. (*Id.*) Thus, Plaintiff alleges, as of the Fall of 1999, all of Plaintiff's remaining escrow funds and those of New Intercounty/Intercounty National had been moved in the 6152 Harris Account. (*Id.*)

According to Plaintiff, by the end of 1999, the balance Plaintiff had on deposit with Old Intercounty/ITI should have exceeded $67 million, (*id.* ¶ 26), and by January of 2000 Old Intercounty/ITI should have been holding more than $68 million of Plaintiff's funds in escrow and "tens of millions of dollars of New Intercounty/Intercounty National escrow funds." (*Id.* ¶ 29.) This was not the case, however. At the end of February 2000, the Old Intercounty/ITI escrow account—the 6152 Harris Bank Account—contained just over $20 million and Old Intercounty/ITI had closed the LaSalle Segregated Account. (*Id.*)

### 3. Discovery & Investigation of Escrow Fund Shortfall

In early 2000, the OBRE and Plaintiff learned that Plaintiff's $68 million in escrow funds were missing from the LaSalle Segregated Account. (*Id.* ¶ 30.)[5] The OBRE and Plaintiff tried to locate these funds, but Hargrove, Capriotti, and Old Intercounty/ITI refused to explain what had happened to the missing funds, how much of the funds remained, or where the remaining funds were. (*Id.*)[6] Plaintiff alleges that Hargrove, Capriotti, and Old Intercounty/ITI defrauded Plaintiff by converting tens of millions in Plaintiff's escrow funds to their own use. (*Id.* ¶ 1.) Plaintiff claims that this "fraud" became apparent to Plaintiff in early 2000, and alleges that it and its regulators were unable to locate Plaintiff's funds and believed that all of the $68 million Plaintiff had transferred pursuant to

---

[5] The somplaint does not indicate how OBRE or Plaintiff learned of the escrow fund shortage.

[6] According to Plaintiff, Hargrove and Capriotti repeatedly invoked he Fifth Amendment to avoid answering questions about Plaintiff's escrow funds beginning in 2000 and continuing until 2005. (*Id.* ¶ 30.)

the escrow arrangement had disappeared.  (*Id.* ¶ 1.)  The discovery that these funds were missing "threw" Plaintiff into receivership in 2000.  (*Id.*)  Plaintiff alleges that it was not until "much later" that Plaintiff and PWC learned that over $20 million of its allegedly misappropriated funds were placed in Defendant's control as a result of Defendant's obtaining control of the escrow accounts that Old Intercounty/ITI previously managed.  (*Id.* ¶ 2.)

On March 9, 2000, New Intercounty informed Defendant that there was a possible shortage in the escrow account that Old Intercounty/ITI managed for New Intercounty and required that Defendant immediately investigate the matter.  (*Id.* ¶ 31.)  New Intercounty initially estimated for Defendant that the escrow shortfall was in the $8 to $10 million range; this caused Defendant great concern because, according to Plaintiff, as a result of Defendant's relationship as a reinsurer to Intercounty National, Defendant was ultimately responsible for any loss or misappropriation of Intercounty National's escrow funds in instances when New Intercounty had served as escrow agent even though the funds were in fact managed by Old Intercounty/ITI.  (*Id.*)  It is Defendant's actions in the aftermath of this discovery that Plaintiff claims are unlawful in this lawsuit.  (*Id.* ¶ 32.)

Upon learning of a possible shortfall on March 9, 2000, Defendant assembled a team of auditors to investigate; the auditors traveled to New Intercounty's offices on March 13, 2000 and stayed there until March 17, 2000.  (*Id.* ¶ 33.)  On April 3, 2000, one of the auditors informed Defendant that he had found a "massive shortage" in the escrow account; in an April 20, 2000 report, the audit team estimated the shortage at over $55 million.  (*Id.* ¶ 34.)  By this date, Defendant had also learned—though it is unclear from whom—that the 6152 Harris Bank Account was supposed to hold at least some of Plaintiff's funds in addition to those of New Intercounty/Intercounty National.  (*Id.*)  More specifically, Defendant learned that there was a transfer of at least $9.2 million of Plaintiff's funds into the Old Intercounty/ITI escrow account in April of 1999.  (*Id.*)

In early May of 2000, Defendant hired Deloitte & Touche ("Deloitte") to investigate "potential inappropriate activity" related to the Old Intercounty/ITI escrow account. (*Id.* ¶ 35.) Deloitte had access to records of Old Intercounty, ITI, New Intercounty, and Intercounty National, including an electronic database that purportedly contained the records of all transactions in the escrow accounts belonging to Old Intercounty and New Intercounty from 1988 to April 2000. (*Id.* ¶¶ 35-36.) In a June 19, 2000 preliminary report, Deloitte confirmed that Old Intercounty had used the 7427 LaSalle Account as its "master escrow account" from November 1995 to the Fall of 1999, and had used the Old Intercounty/ITI escrow account—the 6152 Harris Bank Account—as its "master escrow account" since 1999. (*Id.* ¶ 35.) Deloitte also confirmed for Defendant that in April 1999, $9.2 of Plaintiff's funds may have been inappropriately transferred. (*Id.*) According to Plaintiff, Defendant has admitted that it was from this report that it learned that "massive escrow shortages were caused by theft over a long period of time." (*Id.*)

### 4. Asset Transfers to Defendant in 2000

Plaintiff alleges that upon learning of the missing escrow funds, Defendant threatened to "shut down" New Intercounty and Intercounty National, presumably by exposing wrongdoing in connection with escrow funds, unless Hargrove, Old Intercounty, and ITI gave Defendant substantial assets. (*Id.* ¶ 37.) Between February 22, 2000 and March 13, 2000, Hargrove did give New Intercounty $2,033,194.86 to replace missing funds; Hargrove gave New Intercounty the bulk of this sum—$1,966,264—after March 9, 2000, the date that Defendant learned that New Intercounty/Intercounty National escrow funds were missing and began negotiating with Hargrove to avoid a shutdown of Intercounty National. (*Id.* ¶ 38.) According to Plaintiff, this transfer benefitted Defendant because it reduced the amount Defendant would be obligated to pay New Intercounty/Intercounty National customers whose escrow funds had been misappropriated. (*Id.*)

Around March 17, 2000, Hargrove provided Defendant with certain assets or pledged certain assets as security, including Hargrove's interest in the beneficial interests of certain land trusts; the

value of these real estate assets at the time Hargrove pledged them to Defendant is not known. (*Id.* ¶¶ 39-40.) In April 2000, after Defendant learned that the escrow shortage was possibly as high as $55 million, Defendant again threatened to shut down New Intercounty and Intercounty National, and Hargrove agreed to give Defendant numerous additional personal assets and assets of ITI as security for the escrow shortages; Hargrove estimated the value of these assets as $9 to $10 million. (*Id.* ¶¶ 41-42.) For example, Hargrove had offered to give Defendant a 122-ft. yacht as security and, in May of 2000, this assignment was executed. (*Id.* ¶ 43.) On May 22, 2000, Defendant wrote a letter to Hargrove to finalize the steps to be taken to perfect Defendant's interest in the assets belonging to Hargrove and ITI that Hargrove had previously identified for Defendant. (*Id.* ¶ 44.) Defendant did in fact take possession of substantially all of the assets transferred or pledged by Hargrove and ITI. (*Id.* ¶ 45.) Plaintiff alleges that in return for these assets, Defendant agreed to allow New Intercounty and Intercounty National to stay in business, agreed to "back" New Intercounty's escrow account to the extent of the fair market value of the collateral assigned, and agreed that if it established liability against Hargrove for the missing escrow funds, the value of the collateral transferred plus the money Hargrove deposited with New Intercounty would reduce any judgment against Hargrove. (*Id.* ¶ 46.)

Plaintiff claims that Defendant's promises to Hargrove were of no benefit to him because Hargrove did not own and was not a director of New Intercounty or Intercounty National; because Defendant was already obligated, as the result of its reinsurance agreement with Intercounty National, to cover deficiencies in New Intercounty's escrow account; and because Hargrove already would have been entitled to credit for the amounts he paid Defendant in a subsequent suit brought against him by Defendant. (*Id.* ¶ 47.) Plaintiff further alleges that Defendant, similarly, did not provide ITI with any value for the asset that ITI transferred to Defendant in April 2000. (*Id.*) At the time all of these assets transfers were made, in the first half of 2000, Plaintiff alleges, Hargrove, Old

Intercounty, and ITI were all insolvent as measured under the Illinois Uniform Fraudulent Transfers Act ("IUFTA").  (*Id.* ¶ 50.)

In June 2000, Old Intercounty also assigned its partnership interest in certain real estate properties to Defendant.  (*Id.* ¶ 48.)  As secretary of Old Intercounty, Hargrove executed the assignment documents.  (*Id.*)  According to Plaintiff, Defendant provided no benefit to Old Intercounty in exchange for these assignments. (*Id.*)  Plaintiff refers to the asset transfers described above as the "Spring 2000 Asset Transfers."  (*Id.* ¶ 49.)  Plaintiff also alleges that Hargrove, Old Intercounty, ITI, and other (unidentified) persons who were debtors to Plaintiff may also have transferred other assets to Defendant.  (*Id.* ¶ 75.)

### 5.    Defendant Takes Control of the Old Intercounty/ITI Escrow Account

Plaintiff alleges that, in addition to acquiring assets that belonged to Hargrove, Old Intercounty, and ITI, Defendant also wanted control of Old Intercounty/ITI's escrow account, the 6152 Harris Bank Account.  (*Id.* ¶ 51.)  In order for Defendant to obtain control of the account holding the New Intercounty funds that Defendant reinsured, New Intercounty and Intercounty National, under pressure from Defendant, granted Defendant the authority to "control, monitor and oversee" all escrow accounts of New Intercounty and New Intercounty's accounting and escrow account department.  (*Id.*)

Plaintiff alleges that Defendant soon realized that this was not enough for it to gain control of the escrow account that Old Intercounty/ITI had managed for New Intercounty since 1995; as a result, New Intercounty, under pressure from Defendant, terminated its servicing agreement with ITI on April 26, 2000.  (*Id.* ¶ 52.)  On that same day, Old Intercounty/ITI also granted Defendant the authority to "control, monitor, and oversee" all aspects of "Intercounty's escrow account"[7] and the

---

[7]    The escrow account that Old Intercounty/ITI granted Defendant control over was defined, in the April 26, 2000 agreement as "one or more of the escrow, operating and disbursement accounts in the name of [New] Intercounty and/or ITI, presently existing at the Harris
(continued...)

escrow account and accounting functions of New Intercounty and ITI. (*Id.* ¶¶ 52, 90.) This grant of authority allowed Defendant to maintain, at the expense of New Intercounty and ITI, employees on-site at New Intercounty and ITI to oversee the escrow account and accounting functions of New Intercounty and ITI, and also allowed Defendant to create new accounts "to manage and control the escrow account and accounting functions performed by New Intercounty and/or ITI with respect to title insurance policies underwritten by [Intercounty National]." (*Id.* ¶ 52.) Thus, on April 26, 2000, Defendant took over Old Intercounty/ITI's escrow account—the 6152 Harris Bank Account—which contained some of Plaintiff's remaining escrow funds and New Intercounty/Intercounty National escrow funds. (*Id.* ¶ 53.) When Defendant took over the Old Intercounty/ITI escrow account, it knew that at least $9.2 million in Plaintiff's escrow funds had already been deposited into it. (*Id.* ¶ 90.) Plaintiff also claims that when Defendant took control of the escrow account or shortly thereafter. Defendant knew that Plaintiff had made repeated demands upon Capriotti, Old Intercounty, ITI, and Hargrove to return all such funds to Plaintiff. (*Id.* ¶ 122.)

According to Plaintiff, Defendant had no intention of sharing with Plaintiff the $20 million-plus in escrow funds that remained in the 6152 Harris Bank Account, and planned to convert the entirety of the account previously controlled by Old Intercounty/ITI to its own use. (*Id.* ¶ 53.) Defendant never notified Plaintiff, the OBRE, or the DFI that it now controlled the escrow account or that the escrow account contained Plaintiff's trustholder funds. (*Id.* ¶ 54.) To the extent Defendant gave any "impression," Plaintiff claims, it was only that it had taken control of a New

---

[7](...continued)
Bank and/or one or more such accounts as they may hereafter exist either in [Defendant's name] or subject to control, monitoring and oversight by Defendant . . . ." (*Id.* ¶ 52 n.1.)

Intercounty/Intercounty National escrow account that contained only funds that Defendant was obligated to reimburse as Intercounty National's reinsurer. *(Id.* ¶ 55.)[8]

Further, Defendant did not investigate how much of Plaintiff's money was supposed to be in the 6152 Harris Bank Account. (*Id.*) In fact, on April 26, 2000, Defendant informed the DFI that the size and complexity of the escrow account made it "unfeasible to do a total accounting of all of its activity over a sufficient period of time," and proposed a new solution that would enable Defendant to avoid investigating how much money Plaintiff had on deposit and would require Defendant to reimburse only those persons who specifically requested return of their escrow account funds before Defendant converted the funds to its own use; Defendant proposed to the DFI that it should close the escrow account and open a new account with Harris Bank so that, as the old escrow account winded down, "it [would] be easier to trace the extent of any deficiencies and [would] provide a much more manageable point of audit for both Defendant and the DFI." (*Id.* ¶ 56.)[9]

During the time that Defendant had control of New Intercounty/Intercounty National's operations and Old Intercounty/ITI's escrow account, Plaintiff alleges, Defendant used Plaintiff's escrow funds to limit the amount it would be responsible for under the reinsurance agreement by shifting as much of the loss as possible to Plaintiff and its account holders. (*Id.* ¶ 60.) In other words, Defendant used Plaintiff's escrow funds to reduce the claims New Intercounty/Intercounty National customers could make against Defendant, but made no effort to return any funds to Plaintiff. (*Id.*) The amount of the escrow account as of February 28, 2000 exceeded $20 million; as of June 23, 2000, however, the date on which New Intercounty and Intercounty National ceased operations, as described below, the amount in the account was no more than $13.5 million. (*Id.*)

---

[8]     The complaint is not clear as to how Defendant created this impression and to whom Defendant gave this impression.

[9]     The complaint does not specify how Defendant expressed this proposal to the DFI.

Plaintiff refers to the amount by which Defendant reduced its reinsurance obligations while Defendant was in control of the Old Intercounty/ITI escrow account prior to June 23, 2000 as the "Initial Escrow Funds Transfers." (*Id.*)

### 6. Defendant's Actions as Trustee of New Intercounty/Intercounty National

On June 20 or 21, 2000, Defendant informed the DFI of Deloitte's preliminary findings regarding the Old Intercounty/ITI Escrow account and informed the DFI that it would be cancelling its reinsurance agreement with Intercounty National as of June 23, 2000. (*Id.* ¶ 58.) In response to Defendant's notice, on June 22, 2000, the DFI issued a cease and desist order against Intercounty National effective as of June 23, 2000, and New Intercounty and Intercounty National ceased operations. (*Id.* ¶ 59.)

On June 26, 2000, the DFI issued an order appointing Defendant as trustee of New Intercounty/Intercounty National with the authority to assure the proper distribution of all escrowed funds held by New Intercounty/Intercounty National. (*Id.* ¶ 61.) Under this order, Defendant had the power to distribute escrow funds from the Harris Bank accounts that had been managed by Old Intercounty/ITI and contained Plaintiff's escrow funds. (*Id.*) Defendant did not inform the DFI that these bank accounts contained Plaintiff's escrow funds, but allowed the DFI to believe that they contained only New Intercounty/Intercounty National escrow funds insured by Defendant. (*Id.*) Subsequently, Defendant arranged for the DFI to issue an amended order, dated July 24, 2000, which gave Defendant the authority to access information concerning Old Intercounty/ITI's account records from LaSalle Bank. (*Id.* ¶ 62.) Defendant again did not tell DFI that any of the relevant accounts contained Plaintiff's escrow funds. (*Id.*)

Upon its appointment as trustee on June 26, 2000, Defendant stopped making deposits into or withdrawals from the Old Intercounty/ITI escrow account at Harris Bank. (*Id.* ¶ 63.) Between June 30, 2000 and July 26, 2000, Defendant used its powers as trustee to transfer what remained in this account—over $13 million—to a new account Defendant had opened at Bank of America.

(*Id.*)  Then, on August 21, 2000, Defendant sought written authorization from the DFI to use the $13.5 million in escrow funds in that new account for Defendant's own benefit: to pay fees and costs for recording transaction documents prepared by Defendant during the course of its trusteeship; to pay remaining claims submitted to Defendant as trustee, which arise from funds deposited by or on behalf of customers of Intercounty National or its agents; and to reimburse Defendant for claims it paid based on funds deposited in escrow with Intercounty National or its agents before June 23, 2000.  (*Id.* ¶ 64.)

Defendant and the DFI then entered into an agreement, on August 30, 2000, that allowed Defendant to convert the entire $13.5 million to its own benefit, which, according to the agreement, would serve to resolve remaining claims with respect to funds deposited in escrow with Intercounty National, the entity for whom Defendant was a reinsurer.  (*Id.* ¶ 66.)  The August 30, 2000 agreement did not provide for the return of any escrow funds to Plaintiff.  (*Id.*)  The DFI concurrently issued an order directing that the agreement be immediately and fully implemented; the order noted that since June 26, 2000, Defendant had obtained and reviewed records relating to the Intercounty National's escrow account and had determined "that claims against the escrow account equal approximately $47,000,000[,]" and also noted that Harris Bank had reported that the escrow account had a balance of approximately $13,500,000 on June 23, 2000.  (*Id.* ¶ 67.)  Thus, after August 30, 2000, Defendant transferred all of Old Intercounty/ITI's escrow funds that were in place as of June 23, 2000, including Plaintiff's remaining trust holder funds, to its own use.  (*Id.* ¶ 68.)  Plaintiff refers to this transfer as the "Final Escrow Funds Transfer."  (*Id.*)

Defendant did eventually learn the amount of funds Plaintiff had on deposit with Old Intercounty/ITI.  (*Id.* ¶ 70.)  An October 5, 2000 report prepared within Defendant's organization stated that as of June 19, 2000 Defendant understood that Plaintiff's funds transferred to escrow

totaled $9.2 million, and that, as of October 5, 2000, Defendant learned that Plaintiff's funds transferred to Old Intercounty/ITI's escrow accounts totaled $101.5 million. (*Id.*)[10]

Plaintiff alleges that Defendant made a number of false statements of material fact and omitted to state certain material facts in securing the DFI's approval of Defendant's April 26, 2000 agreement with ITI, the June 26, 2000 order from DFI appointing Defendant as trustee, and the August 30, 2000 agreement authorizing Defendant to disburse remaining escrow funds. (*Id.* ¶ 71.) The following are among the false statements and omissions that DFI is alleged to have relied on to Plaintiff's detriment:

- "[Defendant] informed the DFI and/or gave the impression that the escrow account it took control of was a New Intercounty/[Intercounty National] escrow account."

- "[Defendant] never told the DFI that the account was actually an Old Intercounty/ITI escrow account."

- "[Defendant] informed the DFI and/or gave the DFI the impression that the escrow account . . . contained only escrow funds [to complete] 'bona fide residential, construction or commercial real estate transactions, which transactions remained uncompleted'" by New Intercounty/Intercounty National as of June 23, 2000.

- "[Defendant] never informed or gave DFI the impression that the escrow account contained over $20 million dollars in trust funds that [Plaintiff] had escrowed with Old Intercounty/ITI."

- "[Defendant] never informed the DFI that [Plaintiff's] funds were not received 'for the purpose of effecting the sale, transfer, encumbrance or lease of real property to be held by such escrow agent until title to the real property that is the subject of the escrow is in a prescribed condition,' . . . and that [Defendant] had no authority to act as an escrow agent for [Plaintiff's] funds."

(*Id.* ¶¶ 71-72.) According to Plaintiff, if the DFI had known the truth, it would not have allowed Defendant to convert Old Intercounty/ITI escrow funds to its own use because the DFI had no authority over Plaintiff's funds and could not have issued an order relating to such funds. (*Id.* ¶ 72.)

---

[10] The complaint is not clear as to the basis for this $101.5 million amount and does not explain the vast difference between this amount and Plaintiff's claim that it had some $68 million on deposit with Old Intercounty/ITI in January 2000. (Compl. ¶ 89.)

### 7. Defendant's Concealment of its Knowledge About Plaintiff's Escrow Funds

If Plaintiff had known that Defendant had taken control of the escrow account containing its funds, Plaintiff alleges that it would have demanded that Defendant return all of its escrow funds. (*Id.* ¶ 122.)  Instead, Defendant made affirmative statements in the course of a lawsuit described below, suggesting that it had "taken care of" the parties that had escrowed funds in the accounts for which Defendant was responsible.  (*Id.* ¶ 73.)  For example, on September 14, 2000, Defendant sued, among others, ITI, Old Intercounty, Intercounty National, New Intercounty, Hargrove, Capriotti in the Northern District of Illinois; in that suit, Defendant claimed that after June 26, 2000, Defendant was "making whole those persons who suffered from the theft of escrowed funds." (*Id.*)  Despite what Plaintiff characterizes as "the exercise of reasonable diligence," PWC, Plaintiff's receiver, did not discover that Defendant had taken control of and was appointed trustee of the escrow account into which Plaintiff's funds had been deposited until after Defendant converted the remaining funds to its own use, which the DFI authorized on August 30, 2000.  (*Id.* ¶¶ 68, 74.)

### 8. Related Prior Litigation

On June 1, 2000, PWC commenced, the Circuit Court of Cook County, Chancery Division, litigation against Hargrove, Capriotti, Old Intercounty, ITI, and others on Plaintiff's behalf.  (*Id.* ¶ 76.)  In that action, PWC asserted, among other things, breach of contract and fraud claims, and secured summary judgment the amount of $68 million in Plaintiff's favor against all defendants.  (*Id.*)  In *Independent Trust Corp. v. Hurwick*, 351 Ill. App. 3d 941, 814 N.E.2d 895 (1st Dist. 2004), the Illinois Appellate Court vacated that judgment in part, affirmed the award of summary judgment against Capriotti, and remanded certain issues.  (*Id.*)  On June 13, 2005, the trial court granted PWC's motion to reinstate its claims against Hargrove following remand, and also entered summary judgment against Old Intercounty and ITI with respect to the fraud claim for $68.1 million.  (*Id.* ¶ 77.)  Plaintiff alleges that Defendant knew of Plaintiff's lawsuit against Old Intercounty, ITI, Capriotti, and others seeking control of its escrow funds.  (*Id.* ¶ 122.)  Despite this judgment, Plaintiff claims,

Defendant had long before "wrung Hargrove, Old Intercounty, and ITI dry of any substantial assets, leaving nothing for Plaintiff and its account holders." (*Id.* ¶ 8.)

Hargrove and Capriotti were indicted on fraud charges in federal court on August 12, 2003, *United States v. Capriotti*, 03 CR 779. On June 14, 2005, Capriotti pleaded guilty to four counts of the indictment; in the plea agreement, Capriotti admitted, among other things, "that he and Hargrove participated in a scheme to defraud Plaintiff and its trust account holders." (*Id.* ¶ 78.) On September 15, 2005, a jury convicted Hargrove on ten counts, which included causes of action for mail fraud, wire fraud, and tax fraud; of significance here, the jury found Hargrove guilty on count eight, which alleged that he participated in a scheme to defraud Plaintiff and its trust account holders. (*Id.* ¶ 79.) After Hargrove's conviction but before his sentencing, he reached an agreement to settle Plaintiff's civil action against him by entry of a $50 million judgment against him; at the time Plaintiff filed its amended complaint in this action, that settlement agreement was still awaiting approval from the Chancery court. (*Id.* ¶ 80.) In May 2006, Hargrove and Capriotti were both sentenced to fourteen years for their respective convictions and guilty pleas. (*Id.* ¶ 81.)

### 9. Present Action

Plaintiff filed this action against Defendant on June 20, 2004. (*Id.* ¶ 82.) On September 7, 2004, the parties agreed to stipulate to a dismissal of the action and the court dismissed the initial complaint without prejudice. (*Id.* ¶ 83.) PWC filed suit against Defendant on Plaintiff's behalf on October 5, 2005, and filed the amended complaint, in compliance with the court's scheduling order, on June 30, 2006. (*Id.* ¶¶ 84-85.) It is this complaint that Defendant now challenges in its motion to dismiss.

## DISCUSSION

Federal Rule of Civil Procedure 8(a) requires, in relevant part, that a complaint provide a "short and plain statement" of the claim to give the defendant "fair notice" of the plaintiff's claim and the grounds upon which it rests. FED. R. CIV. P. 8(a); *Cler v. Ill. Educ. Ass'n*, 423 F.3d 726, 729 (7th

Cir. 2005) (citations and internal quotations omitted). On a motion to dismiss, the court accepts the complaint's well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 724 (7th Cir. 2004). Dismissal is proper only if no set of facts, even hypothesized, would entitle the plaintiff to relief. *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 645 (7th Cir. 2006); *Cole*, 389 F.3d at 724. Thus, a complaint will survive a 12(b)(6) motion as long as it narrates an intelligible grievance that, if proved, shows a legal entitlement to relief. *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003) (citations omitted).

This liberal notice-pleading standard does not apply to claims of fraud, however; claims of fraud are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). "[A]ll averments of fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). In essence, the plaintiff must plead, "with particularity," the "circumstances constituting fraud"—the "who, what, when, where, and how" of the fraud. *Id.*; *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citations omitted).

In this motion to dismiss, Defendant contends that Counts II through XI are barred by the statute of limitations, and that Plaintiff has failed to state claims for breach of contract, breach of fiduciary duty, fraudulent concealment, fraud, conversion, violation of the Illinois Title Insurance Act, and fraudulent transfers under the IUFTA. The court addresses these arguments in turn below.

## 1.    Statutes of Limitation

The court first turns to Defendant's argument that all of Plaintiff's claims, excluding its breach of contract claim, are time-barred. Under Federal Rule of Civil Procedure 8, a plaintiff is not required to anticipate or overcome affirmative defenses, such as the statute of limitations, in his complaint. *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006) (citing *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)). "As a result, a federal complaint does not fail to

state a claim simply because it omits facts that would defeat a statute of limitations defense." *Hollander*, 457 F.3d at 691 n.1. But, dismissal on the basis of a statute of limitations defense may be appropriate "when the plaintiff effectively pleads [him or herself] out of court by alleging facts that are sufficient to establish the defense." *Id.* (citing *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)); *see also Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005) (authorizing a district court to dismiss a claim under Rule 12(b)(6) when it is "indisputably time-barred") (citing *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000)). Here, the court concludes that none of Plaintiff's claims are "indisputably time-barred."

Before turning to Defendant's arguments on this issue, the court addresses Plaintiff's contention that the relevant statute of limitations should be extended for each of its claims, either as a result of a tolling agreement between the parties or by reason of the Illinois Corporate Fiduciary Act. (Pl. Response at 4-6.)

### a. Tolling Agreement

The court initially considers Plaintiff's argument that three tolling agreements, (collectively, "the tolling agreement"), executed by the parties to operate to exclude the time between April 9, 2004 and September 30, 2005 from being computed within the running of the relevant statutes of limitation,[11] thus extending the limitations period for each of its claims by approximately seventeen months. (Pl. Response at 4-5.) Defendant disagrees with Plaintiff's interpretation of the tolling agreement and claims that it only tolls the statute of limitations until September 30, 2005 for those actions not time-barred as of April 9, 2004; thus, according to Defendant, the agreement is not relevant to those actions filed after September 30, 2005. (Def. Reply at 4.) Defendant also asserts that the tolling agreement only applies to claims that relate to asset transfers from Jack Hargrove,

---

[11]     Each tolling agreement is explicit that counterparts to it "shall be considered one and the same agreement." (*E.g.*, 6/28/05 Tolling Agreement ¶ 5, Ex. C to Pl. Response.)

Old Intercounty, or ITI in early 2000, and does not apply to claims related to the "Fidelity Escrow Funds Transfers." (*Id.* at 6.)

First, the court disagrees with Defendant's limited view of the claims to which the tolling agreement applies. The tolling agreement relates to "claims or defenses" that "aris[e] from or accru[e] because of the Asset Transfers"; these "Asset Transfers" are defined as Hargrove's transfer of cash to New Intercounty in early 2000, and transfers of cash, personal property, and real property to Defendant by "certain persons, *including*" Hargrove, ITI, and Old Intercounty during the first half of 2000. (4/21/04 Tolling Agreement, Ex. A to Pl. Response; 9/3/24 Tolling Agreement, Ex. B. to Pl. Response; 6/28/05 Tolling Agreement, Ex. C. to Pl. Response (emphasis added).)[12] This definition is broad and non-exhaustive regarding what entities may be considered to have taken part in "Asset Transfers." The court is unwilling to conclude, as Defendant urges, that the tolling agreement's plain language precludes it from covering claims that relate to "Fidelity's alleged control over, and use of, a bank account held by New Intercounty." (Def. Reply at 6.)

Because the terms of the third counterpart of the tolling agreement, dated June 28, 2005, encompass the terms of both earlier counterparts, the court looks only to the language of this third counterpart to determine the tolling agreement's effect. Two provisions are relevant to this determination:

- First, the provision stating that "[a]ny applicable statute of limitations or repose for any claims, defenses, causes of action, rights to payment, equitable remedies, and/or legal remedies arising from or accruing because of the Asset Transfers . . . that the parties hereto may have against one another shall be tolled from April 9, 2004 to September 30, 2005." (6/28/05 Tolling Agreement ¶ 1.)

---

[12]     In the first counterpart to the tolling agreement, executed on April 21, 2004, the word "cash" as it relates to the "Asset Transfers" is crossed out by hand: the word "cash" is, however, included in the definition of "Asset Transfers" in the two subsequent counterparts. (4/21/04 Tolling Agreement; 9/3/24 Tolling Agreement; 6/28/05 Tolling Agreement.) This does not alter the court's determination as to the broad reach of the tolling agreement.

- Second, the provision stating that the "Parties acknowledge and agree that any action commenced on or before September 30, 2005 that was not time barred as of April 9, 2004 shall be deemed timely filed and not timed barred by any statute of limitations, repose or any similar legal or equitable theory, including[,] without limitation[,] laches." (*Id.* ¶ 2.)

When these two provisions are taken together, the court finds the effect of the tolling agreement uncertain. In isolation, the first provision would seem to have the effect that Plaintiff claims—to toll any relevant statute of limitation for the specified time period such that the parties would have approximately seventeen additional months to bring claims past the expiration of each statute of limitations. The second provision, however, supports Defendant's interpretation that the agreement only prevents Defendant from asserting a statute of limitations defense until September 30, 2005 for those actions not time-barred as of April 9, 2004. The uncertainty as to the effect of the agreement becomes apparent when examining how these provisions would function in practice. For example, if the statute of limitations for a particular cause of action would otherwise expire on April 20, 2004–eleven days after the April 9th effective date of the tolling agreement—the first provision would stop the statute of limitations from running for the approximately seventeen months between April 9, 2004 and September 30, 2005, allowing the Plaintiff to file its cause of action eleven days after September 30, 2005. The second provision would have a different effect on these same facts; because the cause of action was not time-barred as of April 9, 2004, the Plaintiff could bring the cause of action until September 30, 2005 without facing a statute of limitations defense, but Defendant could assert such a defense if the case were filed one day later.

Defendant cites *CAMICO Mutual Insurance Company v. Citizens Bank*, No. 05-C-7270, 2006 WL 1006014 (N.D. Ill. Apr. 12, 2006), *aff'd*, 474 F.3d 989 (7th Cir. 2007), to support the position that the tolling provision does not stop the running of the statute of limitations but simply prohibits the assertion of a statute of limitations defense during the effective period. (Def. Reply at 5.) As the court reads that case, however, it actually supports the conclusion that the provision in the tolling agreement at issue is ambiguous. In *CAMICO*, a tolling provision executed between an accounting

firm and Citizens Bank stated that the parties agreed "that all statute of limitations defenses and other defenses relating to the time that claims [were] asserted [were] tolled from [May 1, 2003] through [December 31, 2005]." 474 F.3d at 993. CAMICO filed a declaratory judgment action against Citizens Bank and the accounting firm on December 29, 2005, one day before the tolling agreement expired; Citizens Bank then filed a cross-claim for accounting malpractice against the accounting firm on January 17, 2006. *Id.* at 991. The accounting firm moved for summary judgment, arguing that Citizens Bank's cross-claim was barred by the applicable two-year statute of limitations, and the court agreed. *Id.* Like the Plaintiff in this case, Citizens Bank contended that the tolling agreement established that while the agreement was in effect, the running of the limitations period stopped and the court should have treated the day after the tolling agreement expired as though it were the day after the effective date of the tolling agreement. *Id.* at 992. The accounting firm argued that the tolling agreement only precluded it from asserting specific defenses, including the statute of limitations, during the effective dates of the agreement. 2006 WL 1006014, at *2. The district court and the Seventh Circuit agreed with Defendant's interpretation because, though the verb "toll" has more than one meaning and can mean "to annul or take away" or "to stop the running of[,]" the courts found the particular agreement's terms to be "unambiguous." 474 F.3d at 993. The Seventh Circuit found that the provision did not "specifically [toll] the running of the statute of limitations"; but, rather, it "clear[ly] and "unequivocal[ly]" stated that "only the statute of limitations defenses and other defenses were tolled." *Id.*

As illustrated above, the terms of the tolling agreement in this case are subject to two interpretations that differently impact the relevant statutes of limitation. Although the court declines to interpret the tolling agreement at this stage, the court nevertheless will, to the extent possible, address the parties' remaining arguments that are relevant to whether Plaintiff's claims are time-barred.

### b. Receivership Limitations Period

Plaintiff also contends that the Illinois Corporate Fiduciary Act extends each of the relevant statutes of limitation for six months, and that the court should calculate the relevant limitations periods accordingly. Plaintiff argues that 205 ILCS 620/6-7 extends, for six months, the limitations period for all actions brought by a receiver appointed by the Commissioner. (Pl. Response at 6.) Defendant contends that 205 ILCS 620/6-7 extends the statute of limitations only when it would expire within the first six months after a receiver's appointment, in effect, giving the receiver until six months after possession to bring such claims. (Def. Reply at 7.) While no court has yet to interpret 205 ILCS 620/6-7, this court concludes that Defendant is correct. The statute provides:

> If the Commissioner . . . appoints a receiver [for the purpose of taking possession and control of a corporate fiduciary and its assets] . . . any period of limitations fixed by statute or agreement *which would otherwise expire* on a claim or right of action of corporate fiduciary . . . *shall be tolled until 6 months after the commencement of such possession* . . . .

205 ILCS 620/6-7 (emphasis added). Under the plain language of the statute, only a statute of limitations set to expire within six months after a receiver's possession is tolled, and it is always tolled until six months after the receiver's possession of the fiduciary and its assets. The statute has no applicability in this case. PWC took control of Plaintiff on April 14, 2000. The earliest date Defendant proposes for the running of any of the statutes of limitation in this case is June 1, 2000. Because the shortest applicable limitations period to any of Plaintiff's claim is three years, (*see infra* n.13), none of the statutes of limitation relevant to Plaintiff's claims would have expired within the first six months of PWC's possession of Plaintiff and its assets. The court therefore will not extend any limitations period pursuant to 205 ILCS 620/6-7.

### c. Commencement of the Statutes of Limitation Relevant to Plaintiff's Claims[13]

---

[13]     The following are the statues of limitation applicable to each of the eleven claims Defendant challenges as time-barred under Illinois law. A three-year statute of limitations applies

(continued...)

Defendant's argument that Counts II-VIII and Count XI are time-barred is based on its view that Plaintiff "knew that its deposits in the Old Intercounty/ITI escrow account had been misappropriated . . . no later than June 1, 2000, and likely earlier than that." (Def. Mem. at 4-5.) Thus, Defendant contends, the statutes of limitation for Plaintiff's claims began running on June 1, 2000 for those acts that occurred before June 1, 2000, and on the day of the acts or transfers that occurred after June 1, 2000, which, in Defendant's view, all took place before July 26, 2000. (*Id.* at 5; Def. Reply at 2.) Plaintiff contends that the statutes of limitation could not have commenced before Defendant completed the wrongful acts that are the basis for Plaintiff's claims. In other words, Plaintiff argues, the claims could not have accrued until Defendant removed the funds from the Old Intercounty/ITI escrow account and used them for its own benefit, instead of returning them to Plaintiff. (Pl. Response at 6-8.) According to Plaintiff, the complaint does not allege that such conduct was complete as of June 1, 2000 and Plaintiff could not have known about the particular injuries at issue in this action before such conduct was complete. (*Id.*)[14]

Neither Plaintiff nor Defendant disputes the applicability of the discovery rule to the claims here. Under that doctrine, the relevant statute of limitations does not begin to run until a plaintiff "knows or reasonably should have known of his injury and also knows or reasonably should have

---

[13](...continued)
to Plaintiff's claim under the Illinois Consumer Fraud and Deceptive Business Practice Act. 815 ILCS 505/10a(e). As for Plaintiff's claims under the IUFTA, Plaintiff is entitled to a four-year statute of limitation for its claim under Section (5)(a)(1), or a one-year limitation from when the fraudulent transfer or obligation incurred could have been reasonably discovered by the claimant if the four-year period expired. 740 ILCS 160/10(a). A four-year statute of limitations also applies to Plaintiff's claims under Sections 5(a)(2) and 6(a) of the IUFTA. 740 ILCS 160/10(b). A five-year statute of limitations applies to the remaining claims: breach of fiduciary duty, fraud, fraudulent concealment, conversion, violation of the Illinois Title Insurance Act, and unjust enrichment. 735 ILCS 5/13-205.

[14]    Plaintiff notes that Defendant argued in other litigation that the commencement of the statute of limitations was tied to its own knowledge of specific fraudulent transfers. (Pl. Response at 8.) Thus, Plaintiff contends, Defendant is judicially estopped from arguing that the statutes of limitation began running at that time. Defendant is correct that the doctrine of judicial estoppel is applicable here only if Defendant prevailed on its argument in the earlier litigation. As explained *infra*, however, the court finds in favor of Plaintiff for other reasons. (Def. Reply at 3.)

known that it was wrongfully caused." *Santa Claus Indus., Inc. v. First Nat. Bank of Chicago*, 216 Ill. App. 3d 231, 236, 576 N.E.2d 326, 329-30 (1st Dist. 1991) (citing *Knox College v. Celotex Corp.*, 88 Ill.2d 407, 430 N.E.2d 976 (1981)).[15]  A plaintiff knows that his injury is "wrongfully caused" when he has "sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Weidman v. Wilkie*, 277 Ill. App. 3d 448, 454, 660 N.E.2d 157, 160 (1st Dist. 1995).  A statute of limitations can, however, commence before a plaintiff knows the full extent of his injuries. *Alioto v. Marshall Field's & Co.*, 77 F.3d 934, 937 (7th Cir. 1996) (applying Illinois law).

Plaintiff and Defendant disagree on whether an injured party must be aware of the identity of the wrongdoer in order for the statute of limitations to start running.  Plaintiff cites *In re Copper Antitrust Litigation*, 436 F.3d 782, 792 (7th Cir. 2006), for the proposition that, "[u]nder the discovery rule, the statute does not begin running until the plaintiff discovers that he has been injured and who caused the injury."  (Pl. Response at 10-11.)  Defendant cites a different Seventh Circuit case that points in another direction.  (Def. Reply at 2-3.)  In *Fidelity National Title Insurance Company of New York v. Howard Savings Bank*, the Seventh Circuit stated that a statute of limitations does not begin to run until the plaintiff discovers he has been "wrongfully injured"; the court then stated that the plaintiff "doesn't have to know who injured him" in order for the statute of limitations to begin to run. 436 F.3d 836, 839 (7th Cir. 2006); *see also Wells v. Travis*, 284 Ill. App. 3d 282, 291, 672 N.E.2d 789, 795 (2d Dist. 1996) (rejecting the proposition that a plaintiff must have reason to know of the negligence of a *particular* defendant in order to know that his injury was wrongfully caused).  In this

---

[15]    The court notes, however, that the discovery rule does not apply to Counts IX and X, brought under Sections 160/6(a) and 160/5(a)(2) of the IUFTA, respectively.  The IUFTA is clear that actions brought under these two provisions must be brought "within 4 years after the transfer was made or the obligation was incurred."  740 ILCS 160/10(b).  As for Count VIII, brought under 740 ILCS 160/5(a)(1) of the IUFTA, the discovery rule has some applicability; a claim brought under 740 ILCS 160/5(a)(1) is extinguished "4 years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."  740 ILCS 160/10(a).

case, the court follows the rule set forth in *Fidelity National Title Insurance*, where the Seventh Circuit explicitly applied Illinois law in discussing the discovery rule; *Copper Antritrust* addressed a federal claim and did not consider state law. *See Hollander*, 457 F.3d at 694 (citations omitted) ("Like the statute of limitations itself, rules that are an 'integral part of the statute of limitations,' such as tolling and equitable estoppel, are treated as substantive for purposes of the *Erie* doctrine.") Thus, the court will consider the relevant statutes of limitation to have commenced at the time at which Plaintiff knew of the injury it now complains of and knew that it was wrongfully caused, regardless of whether Plaintiff knew who caused its injury.

Even so, the court cannot conclude at this stage that Plaintiff has effectively pleaded itself out of court or established that its claims are "indisputably time-barred." *See Small*, 398 F.3d at 898. The earliest time period mentioned in the complaint as it relates to Plaintiff's awareness of wrongdoing in connection with its escrow funds is "early 2000." (*See* Compl. ¶ 1.) Specifically, Plaintiff alleges that in "early 2000" it was aware that Hargrove and Capriotti "caused [Plaintiff] to transfer tens of millions in trust holder funds to [Old Intercounty/ITI,]" and then "Hargrove, Capriotti, and Old Intercounty/ITI . . . defrauded [Plaintiff] by converting tens of millions in [Plaintiff's] escrow funds to their own use." (*Id.*) Indeed, PWC filed suit against Hargrove, Capriotti, Old Intercounty, ITI and others, not including Defendant, on June 1, 2000, asserting breach of contract and fraud claims on Plaintiff's behalf. (*Id.* ¶ 76.) Plaintiff also admits that, in early 2000, Plaintiff and its regulators were unable to locate the $68 million it had deposited with Old Intercounty/ITI and "believed that all of [Plaintiff's] $68 million in escrow funds had disappeared." (*Id.* ¶ 1.) Despite these allegations that establish Plaintiff's suspicion of some "fraud" in "early 2000," other allegations reflect that Defendant's alleged wrongful conduct that is the source of the injuries Plaintiff complains of in this suit occurred in the latter half of 2000. For example, Defendant sought written permission from the DFI to use the $13.5 million in remaining escrow funds on August 21, 2000, and the DFI granted this permission on August 30, 2000. (*Id.* ¶¶ 64-66.) The complaint does not identify the

27

exact date that these funds were actually transferred to Defendant or the date on which Defendant allegedly converted these funds to its own use.  (*See id.* ¶ 68.)

Construing all facts in Plaintiff's favor, as this court must at this stage, the court is not satisfied that Plaintiff's awareness of some "fraud" in early 2000 because it "believed" funds disappeared from the Old Intercounty/ITI escrow account sufficiently establishes that Plaintiff was or reasonably should have been aware that it had been wronged as alleged in this action.  The claims alleged here primarily focus on Plaintiff's injury as the result of fraudulent transfers and misrepresentations and omissions made to Plaintiff and the DFI.  Even recognizing that the statute of limitations could have begun to run before Plaintiff knew who was responsible for the injuries, *Fidelity National Title Insurance*, 436 F.3d at 839, the court cannot discern from the complaint when Plaintiff became aware of the injuries itself.  The allegations in Plaintiff's complaint therefore do not demonstrate that "nothing the plaintiff can prove would bring [its claims] within the statute."  *Curry v. A.H. Robins Co.*, 775 F.2d 212, 217 (7th Cir. 1985).

The district court reached a similar conclusion in *Fidelity National Title Insurance Company*. Fidelity, the Defendant here, was the plaintiff in that action against a number of banks which allegedly received fraudulent transfers from Old Intercounty, in violation of IUFTA, *Fidelity Nat. Tit. Ins. Co. of NY v. Howard Sav. Bank*, No. 02-C-643, 2003 U.S. Dist. LEXIS 25933, *1 (N.D. Ill. Feb. 11, 2003).  The relevant IUFTA provision incorporated the discovery rule.  *Id.* at *4; *see* 740 ILCS 160/10(a).  As Fidelity now argues here, the banks there urged the statute of limitations should commence when Fidelity learned of the "overall fraudulent scheme."  *Id.* at **4-5.  The court disagreed, observing that defendants were "confusing the injury Fidelity suffered from Capriotti's and Hargrove's [earlier] scheme to siphon funds from the escrow accounts with the injury Fidelity suffered from the fraudulent transfers [later] committed to conduct the scheme."  *Id.* at *5.  At the summary judgment stage in *Fidelity National Title Insurance*, the court further explained the

reasoning it had employed at the motion to dismiss stage. No. 02-C-643, 2004 U.S. Dist. LEXIS 18806, **35-36 (N.D. Ill. Sept. 20, 2004). The court acknowledged that the statue of limitation could commence to run even if Fidelity had not completed its investigation and determined for certain which banks had received fraudulent transfers. The court nevertheless concluded that Fidelity's knowledge that the escrow accounts had been depleted did not put Fidelity on sufficient notice that fraudulent transfers, the injury complained of in the action before the court, had occurred. *Id.* at *36. On a more fully developed summary judgment record, on the other hand, the court concluded that the statute of limitations had commenced at the time that Fidelity should have known that it had a possible cause of action for fraudulent transfer and should have begun an investigation into the existence of that cause of action. *Id.* at *38.

Here, similarly, the court cannot conclude from the allegations in the complaint that Plaintiff's belief that its escrow funds had disappeared because of the fraud of Hargrove, Capriotti, and Old Intercounty was sufficient to put Plaintiff on sufficient notice that it needed to investigate the claims it raises here. Thus, Plaintiff has not pleaded itself out of court on statute of limitations grounds. Although the question of when a plaintiff was on notice that he had been wrongfully caused an injury is ordinarily a question for the jury, *Weidman*, 277 Ill. App. 3d at 454, 660 N.E.2d at 160, the court is, of course, open to reconsidering the issue on a more complete record on summary judgment.

The court noted earlier that the discovery rule does not apply to certain claims under the IUFTA, specifically Counts IX and X, (*see supra* n.15); these claims must be brought "within 4 years after the transfer was made or the obligation was incurred." 740 ILCS 160/10(b). The court nevertheless cannot determine, based solely on Plaintiff's complaint, when the statutes of limitation for these claims commenced. Both of these claims relate to the "Fidelity Asset Transfers," which include the final transfer of Old Intercounty/ITI's escrow funds to Defendant's use. Plaintiff has not alleged precisely when the remaining Old Intercounty/ITI funds were converted to Defendant's use

or when Defendant used these funds for its own benefit. While it is true that the DFI instructed that its August 30, 2000 order allowing the remaining funds to be converted to Defendant's use "be immediately and fully implemented" and that Plaintiff asserts that this occurred sometime "after August 30, 2000," the court declines to speculate as to the exact date on which such transfers were completed. (Compl. ¶¶ 66-68.) Without an understanding of when the wrongful acts that Plaintiff complains of were completed, the court cannot conclude that Counts IX and X are "indisputably time-barred."

Because the court cannot determine when the statutes of limitation for each of Plaintiff's claims began running, the court need not reach the remaining arguments the parties have made regarding the applicable statutes of limitation. Chief among these are: (1) whether Defendant fraudulently concealed its wrongdoing, thus tolling the statutes of limitation; and (2) whether Plaintiff's claims should be considered to have been commenced on October 5, 2005, the date this suit was initially filed, or on June 30, 2006, the date Plaintiff filed the amended complaint that Defendant now challenges.[16] Without the ability to determine when the statutes of limitation commenced, reaching conclusions on either of these arguments at this juncture would not aid the court in determining whether Plaintiff's claims are time-barred.

### 2. Failure to State a Claim

#### a. Breach of Contract (Count I)

---

[16] Although Plaintiff alleges that the instant suit was filed on June 20, 2004, (*id.* ¶ 82), the court considers the original date of filing to be October 5, 2005. Where a case is dismissed without prejudice, it is treated as if the suit had never been filed for statute of limitations purposes. *See Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 923 (7th Cir. 2003) (citing *Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000)). This court granted a stipulation to dismiss the suit filed on June 20, 2004 without prejudice, therefore the June 20, 2004 filing is of no significance to this motion. (Compl. ¶ 83.)

Plaintiff sets forth two breach of contract theories in its complaint: First, Plaintiff contends that Defendant assumed Old Intercounty/ITI's responsibilities under the 1990 escrow agreement between Plaintiff and Old Intercounty when ITI granted Defendant control over the Old Intercounty/ITI escrow account, and that Defendant subsequently breached those contractual responsibilities by misappropriating Plaintiff's escrow funds. (Compl. ¶¶ 87-82.) In the alternative, Plaintiff alleges that it was a third-party beneficiary to the April 26, 2000 agreement between Defendant and ITI that gave Defendant the authority to oversee the Old Intercounty/ITI escrow account, and that Defendant breached this agreement thereby damaging Plaintiff and its account holders. (*Id.* ¶ 93.) Defendant contends that Plaintiff's allegations do not support a claim for breach of contract against Defendant under either theory. (Def. Mem. at 7.) The court agrees with Defendant.

## I.        Breach of 1990 Escrow Agreement

First, Defendant argues that Plaintiff's allegations that Old Intercounty was the alter ego of ITI are insufficient to extend liability to Defendant, who contracted with ITI to take control of the Old Intercounty/ITI escrow account, for breach of the escrow agreement between Plaintiff and Old Intercounty. Defendant further argues that the April 26, 2000 agreement does not delegate to Defendant any of Old Intercounty or ITI's duties under the 1990 escrow agreement, and that even if the April 26, 2000 agreement did delegate such duties, Plaintiff would only have a breach of contract claim against Old Intercounty or ITI—the delegating parties. (Def. Mem. at 7-8.) Plaintiff contends that Defendant voluntarily assumed Old Intercounty/ITI's obligations under the 1990 escrow agreement when it entered into the April 26, 2000 agreement. (Pl. Response at 12-13.) Plaintiff further argues that Defendant is liable despite the fact that it had duties solely by virtue of delegation. (*Id.* at 13.)

In Illinois, an action for breach of contract requires a plaintiff to allege "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the

defendant; and (4) resultant injury to the plaintiff." *Gonzalzles v. Am. Exp. Credit Corp.*, 315 Ill. App. 3d 199, 206, 733 N.E.2d 345, 351 (1st Dist. 2000) (citing *Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192, 199, 721 N.E.2d 605 (1st Dist. 1999)).  Plaintiff has sufficiently pleaded that the 1990 escrow agreement was a valid and enforceable contract, that Plaintiff fully performed its obligations under the contract, that Defendant breached the contract, and that Plaintiff suffered damages as a result. (*See* Compl. ¶¶ 86-92.)  But the court nevertheless must consider Defendant's argument that, as a matter of law, Plaintiff cannot enforce the 1990 escrow agreement against Defendant.

Plaintiff's breach of contract theory rests on the assumption that it would be able to enforce the 1990 escrow agreement, which was between Plaintiff and Old Intercounty, against ITI.  (*See* Compl. ¶ 88.)  In Illinois, a parent company may be held liable for the obligations of its subsidiary if there is a showing of "unity of interest and ownership such that the separate personalities" of the parent and subsidiary no longer exist, and where viewing the companies as separate entities would "sanction a fraud or promote injustice." *Liberty Mut. Ins. Corp. v. M&O Springfield Co.*, 172 F.3d 53, (TABLE), Text in WESTLAW, 1998 WL 894654 *2 (7th Cir. 1998) (applying Illinois law).  Defendant admits that Plaintiff's allegations that ITI was the alter ego of Old Intercounty may be sufficient to impose liability on ITI for Old Intercounty's obligations under the 1990 escrow agreement.  (Def. Mem. at 8.)  Plaintiff alleges, and the court assumes to be true, that ITI owned and operated Old Intercounty without regard for its corporate form, and there was a unity of interest between ITI and its subsidiary, Old Intercounty, such that it would "sanction a fraud and promote an injustice to observe that the two companies had separate corporate existences." (Compl. ¶ 86.)  Plaintiff has adequately pleaded that ITI was bound by the 1990 escrow agreement.

Having established, for the purpose of this motion to dismiss, that ITI was bound by the 1990 escrow agreement, the court turns to whether, as a result of the April 26, 2000 contract between Defendant and ITI, Defendant became bound by that agreement.  In relevant part, the April 26, 2000

agreement between ITI and Defendant granted Defendant "the authority to control, monitor and oversee all aspects and functions of Intercounty's Escrow Account, as well as the escrow account and account functions of Intercounty and/or ITI." (4/26/00 Agreement ¶ 10, Ex. to Def. Mem in Support of Motion to Dismiss.)[17] According to Plaintiff, when Defendant was granted this authority, it was aware that at least $9.2 million in Plaintiff's escrow funds were held in the Old Intercounty/ITI escrow account. (Compl. ¶ 90.) But Plaintiff cites no support for the proposition that Defendant's awareness that the account contained Plaintiff's funds constitutes consent on Defendant's part to acceptance of Old Intercounty/ITI's obligations under the 1990 escrow agreement. The April 26, 2000 agreement does not suggest that, by entering into it, Defendant assumed or was assigned Old Intercounty or ITI's contractual obligations, in general, or Old Intercounty or ITI's duties under the 1990 escrow agreement in particular. (*See id.*) Plaintiff does not allege that such an assumption was explicit in the April 26, 2000 agreement, and the court finds no basis to conclude that a grant of authority to "control, monitor, and oversee" the Old Intercounty/ITI escrow account, without further specificity, is tantamount to Defendant's acceptance of responsibility under Plaintiff's decade-old escrow agreement with Old Intercounty. Thus, the court concludes that Plaintiff has not sufficiently stated a claim for the breach of the 1990 escrow agreement.[18]

### ii.    Plaintiff's Claim as Third-Party Beneficiary

---

[17]    When a defendant attaches a document to a motion to dismiss that is referred to in the plaintiff's complaint and is central to the plaintiff's claim, the court can consider the document without converting the motion to one for summary judgment. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (collecting cases). That is the cases here, thus, despite that the Plaintiff did not attach the April 26, 2000 agreement to its complaint, the court will consider it.

[18]    Because the court finds no basis on which to conclude that the April 26, 2000 agreement delegated Old Intercounty/ITI's duties under the 1990 escrow agreement to Defendant, the court need not resolve the parties' dispute regarding whether a party to whom a duty is delegated can be held liable for failure to perform the delegated duties.

33

Plaintiff contends, in the alternative, that it was a third-party beneficiary to the April 26, 2000 agreement between ITI and Defendant, which granted Defendant control over the Old Intercounty/ITI escrow account. Defendant argues that there is no express provision in the April 26, 2000 agreement that confers third-party beneficiary status on Plaintiff, nor is there any implication that the parties intended Plaintiff to be a beneficiary of the agreement. (Def. Mem. at 9.) Plaintiff insists that it is clear that Defendant assumed control over an account with third-party beneficiaries, that Defendant intended third-parties would benefit from the contract, and that, in any case, dismissal would be improper because Plaintiff may establish at trial that Defendant intended Plaintiff to be a third-party beneficiary to the April 26, 2000 agreement. (Pl. Response at 14.)

Under Illinois law, it is well-established that if a contract is entered into for the direct benefit of a third-party, the third party may sue for breach of that contract, even if he is "a stranger to the contract and the consideration." *Olson v. Etheridge*, 177 Ill.2d 396, 404, 686 N.E.2d 563, 566 (1997) (citing *Joslyn v. Joslyn*, 386 Ill. 387, 400, 54 N.E.2d 475 (1944); *Carson Pirie Scott & Co. v. Parrett*, 346 Ill. 252, 257, 178 N.E. 498 (1931)). If the benefit to the third party is "merely incidental," the third party has no right of recovery under the contract. *Golden v. Barenborg*, 53 F.3d 866, 870 (7th Cir. 1995) (citing *Carson Pirie Scott*, 346 Ill. at 257, 178 N.E. at 501). Whether a third party is an intended beneficiary depends on whether the contracting parties "have manifested in their contract an intention to confer a benefit upon the third party"; while the contract need not identify the third-party beneficiary by name, the liability appearing in the contract cannot be enlarged on the grounds that "the situation and circumstances of the parties justify or demand further or other liability." *Altevogt v. Brinkoetter*, 85 Ill. 2d 44, 55-57, 421 N.E. 2d 182, 187-88 (1981) (citing *Carson Pirie Scott*, 346 Ill. at 258, 178 N.E. 498). If a contract does not expressly provide for a third-party beneficiary, the implication that the contract was intended to benefit a third-party "must be so strong as to be an express declaration." *Estate of Willis v. Kiferbaum Constr. Corp.*, 357 Ill. App. 3d 1002, 1008, 830 N.E. 3d 636, 643 (1st Dist. 2005).

Defendant is correct that there is no language in the April 26, 2000 agreement to indicate that Plaintiff was an intended third-party beneficiaries to the agreement. Nor has Plaintiff cited case law to support that an escrowee in its position, one who was not aware of the contract under which it now claims third-party beneficiary status at the time of its execution, can later sue as a third-party beneficiary. In any case, while Plaintiff pleaded that it was a third-party beneficiary to the April 26, 2000 agreement, it did not allege that the agreement was intended for its benefit. (*See* Compl. ¶ 93.) As this is essential to Plaintiff's ability to maintain a claim as a third-party beneficiary, Plaintiff's allegations are insufficient to establish that Plaintiff is entitled to relief for breach of contract as a third-party beneficiary. *See U.S. Gypsum Co.*, 350 F.3d at 626 (complaint will survive a motion to dismiss as long as it narrates an intelligible grievance that, if proved, shows a legal entitlement to relief).

### b. Breach of Fiduciary Duty (Count II) & Fraudulent Concealment (Count IV)

Defendant also argues that Plaintiff has not stated a claim for breach of fiduciary duty or fraudulent concealment, both of which require that Defendant owed fiduciary duties to Plaintiff. (Def. Mem. at 9-10.) According to Defendant, fiduciary duties arising from an escrow arrangement only flow to the parties to the escrow agreement. Accordingly, Defendant owed no fiduciary duties to Plaintiff and cannot maintain a claim for either breach of fiduciary duty or fraudulent concealment. (*Id.* at 10.) Plaintiff contends that Defendant's fiduciary duties arose once Defendant took control of the escrow account it knew to contain Plaintiff's funds, regardless of whether Plaintiff was bound by the terms of the 1990 escrow agreement. (Pl. Response at 14.)[19] The court concludes that Plaintiff's allegations do not support that Defendant owed Plaintiff a fiduciary duty.

Defendant is correct that claims for breach of fiduciary duty and fraudulent concealment are

---

[19] Plaintiff also argues that Defendant acquired fiduciary duties to Plaintiff when it accepted the assignment of Old Intercounty/ITI's rights under the escrow agreement. (Pl. Response at 14-15.) The court concluded above that Plaintiff's allegations do not support a determination that such an assignment took place. (*See supra* Section 2.a.i.)

both premised on the fact that Defendant owed Plaintiff a fiduciary duty. In order to state a claim for breach of fiduciary duty under Illinois law, Plaintiff must allege that "a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains." *Antotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006) (citing *Neade v. Portes*, 193 Ill.2d 433, 739 N.E.2d 496, 502 (2000)); *Int'l Capital Corp. v. Moyer*, 347 Ill. App. 3d 116, 122, 806 N.E.2d 1166, 1171 (1st Dist. 2004). Similarly, in order to state a claim for fraudulent concealment, Plaintiff must allege the existence of a fiduciary relationship which gives rise to the "duty to speak." *Lillien v. Peak 6 Investments, L.P.*, 417 F.3d 667, 671-72 (7th Cir. 2005) (citing *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 799 N.E.2d 756, 765-66 (1st Dist. 2003)).

The only basis on which Plaintiff alleges that Defendant owed Plaintiff fiduciary duties is as a result of Defendant's obtaining control of Old Intercounty/ITI's escrow account; Plaintiff alleges that Defendant "became a fiduciary to all who had placed funds in such accounts." (Compl. ¶ 95.) An escrowee "may become the trustee of both the party making the deposit and the one for whose benefit it is made"; like a trustee, the escrowee has a duty to act "only according to the terms of the escrow instructions." *Bescor, Inc. v. Chicago Title & Trust Co.*, 113 Ill. App. 3d 65, 69, 446 N.E.2d 1209, 1213 (1st Dist. 1983) (citing *Toro Petroleum Corp. v. Newell*, 33 Ill. App. 3d 222, 338 N.E.2d 491 (1st Dist. 1974); *Stark v. Chicago Title & Trust Co.*, 316 Ill. App. 353, 45 N.E.2d 81 (1st Dist. 1942)). Someone not a party or privy to an escrow agreement cannot be sued for breaching a fiduciary duty arising out of the agreement, however. *See Bescor, Inc.*, 113 Ill. App. 3d at 69, 446 N.E.2d at 1213 ("[T]he fiduciary duty rule . . . relates only to *parties* to the escrow agreement and is therefore not supportive of plaintiff's claim under a third-party beneficiary status."); *TRW Title Ins. Co. v. Security Union Title Ins.*, No. 93-C-7555, 1994 WL 194262 (N.D. Ill. May 16, 1994) ("Claims for breaches of fiduciary duty related to an escrow agreement are limited to parties to the escrow agreement and their privies.") (citations omitted).

As the court explained above, Defendant was not a party to the 1990 escrow agreement, nor did Defendant undertake obligations under the 1990 escrow agreement upon obtaining control over the Old Intercounty/ITI escrow account. (*See supra* Section 2.a.i.) Defendant also did not owe a fiduciary duty to the escrow funds themselves. *TRW Title Ins. Co.*, 1994 WL 194262, at *4 (citing *In re BNT Terminals, Inc.*, 125 B.R. 963, 969 (N.D. Ill. 1991); *Bescor*, 113 Ill. App. 3d 65, 446 N.E.2d at 1213) ("Count II alleges that [defendant] was a fiduciary of the escrow fund and that it breached its fiduciary duties by failing to prevent the misappropriation of funds. [Plaintiff] contends that [defendant] owed a fiduciary duty to the escrow fund itself. The duty, however, is owed to the parties to the escrow accounts, not the fund itself.") Thus, the court cannot conclude that Defendant owed Plaintiff a fiduciary duty by virtue of the fact that Defendant obtained control of an escrow account alleged to hold some of Plaintiff's funds. Because Plaintiff's allegations are insufficient to establish that Defendant owed Plaintiff a fiduciary duty, the court finds that Plaintiff has failed to state a claim for breach of fiduciary duty and fraudulent concealment.

### d.     Fraud (Count III)

Defendant contends that Plaintiff has also failed to state a claim for fraud. (Def. Mem. at 10-11). Defendant argues that Plaintiff has failed to plead fraud with the required particularity, and does not allege that any of Defendant's alleged affirmative misrepresentations were false. (*Id.*; Def. Reply at 11-12.) Defendant further contends that its alleged omissions should be considered as a part of Plaintiff's fraudulent concealment claim under Count IV, but not Plaintiff's claim for fraud in Count III. (Def. Reply at 11-12.) Plaintiff argues that it has sufficiently alleged both fraudulent communications and fraudulent omissions, and that certain specifics not pleaded are within only Defendant's possession and control. (Pl. Response at 15-17.) The court finds Plaintiff's allegations sufficient.

As a preliminary matter, Defendant is correct that Plaintiff's allegations as to Defendant's alleged omissions are relevant to Plaintiff's claim for fraudulent concealment (Count IV) as opposed

to a fraud claim based on affirmative misrepresentations. *Thornwood*, 344 Ill. App. 3d at 25, 799 N.E.2d at 765 ("'Fraud also may consist of the intentional omission or concealment of a material fact under circumstances creating an opportunity and duty to speak.'") (quoting *H.K. Warner v. Lucas*, 185 Ill. App. 3d 351, 354, 541 N.E.2d 705 (5th Dist. 1989)). Thus, the court will not discuss the sufficiency of Plaintiff's allegations that relate to Defendant's alleged omissions here.

Under Illinois law, a plaintiff claiming fraud must plead that "(1) that the defendant made an untrue statement of material fact; (2) that he knew or believed the statement to be false; (3) that the statement was made to induce the plaintiff to act; and (4) that the plaintiff acted in justifiable reliance upon the statement." *Mitchell v. Norman James Constr. Co.*, 291 Ill. App. 3d 927, 939-40, 684 N.E.2d 872, 882-83 (1st Dist. 1997) (citations omitted). While Plaintiff's complaint includes all of these allegations generally, (*see* Compl. ¶¶ 100-103), the court must consider whether these allegations were stated "with particularity"; in other words, Plaintiff must have specified the "who, what, when, where, and how" of the fraud in its complaint. *Borsellino*, 477 F.3d at 507.

In its brief, Plaintiff points to a number of allegations that, in Plaintiff's view, sufficiently allege affirmative fraudulent statements. Among these statements are Defendant's statement to the DFI on April 26, 2000, that "the magnitude of the [Intercounty National] escrow account ma[de] it unfeasible to do a total accounting of all its activity over a sufficient period of time." And, that Defendant also stated to the DFI on April 26, 2000 that it believed "a more accurate and cost-effective determination of any escrow shortfall [could] be made by closing the old and opening a new one[,]" which would make it "easier to trace the extent of any deficiencies and [would] provide a much more manageable point of audit for both [Defendant] and the DFI." (Compl. ¶ 56.) This allegation is sufficiently particular as to the circumstances of the alleged fraudulent communication; it specifies the parties to the communication, the date of the communication, and states the content of the communication in detail. To the extent that any specific information about the circumstances is missing, the court

finds that some relaxation of Rule 9(b)'s requirements is appropriate given that the alleged fraudulent communication was made to a third-party and Plaintiff might not be aware of every detail of how the communication occurred. *See Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1051 (7th. Cir. 1998)

Defendant argues that Plaintiff never alleged that this statement was false, which is a necessary element of a fraud claim. (Def. Reply at 12.) While Plaintiff does not explicitly allege that this statement was false, Plaintiff does allege that Defendant's made "false and misleading statements" to the DFI regarding the Old Intercounty/ITI escrow account. (Compl. ¶ 100.) Moreover, immediately preceding its allegations regarding Defendant's April 26, 2000 statement to the DFI, Plaintiff alleged that Defendant did not want to perform the investigation, in part, because it would have revealed that the Old Intercounty/ITI escrow account was supposed to contain Plaintiff's funds, which would require Defendant to turn over much of what remained in the account to Plaintiff. (*Id.* ¶ 55.) Drawing all reasonable inferences in Plaintiff's favor, as this court must, the court finds the allegations sufficient to support that Plaintiff believes that Defendant's April 26, 2000 statement to the DFI, which gave somewhat different reasons for declining to perform an investigation of the escrow account and for opening a new account, was false. Rule 9(b)'s particularity requirement does not require Plaintiff to go so far as to plead facts showing that the representation was indeed false. *Bankers Trust Co. v. Old Republic Ins.*, Co., 959 F.2d 677, 683 (7th Cir.1992).

As to the other allegations that Plaintiff points to as the source of affirmative fraudulent statements, the court is not so persuaded. Plaintiff does allege with particularity that Defendant wrote to the DFI on August 21, 2000 requesting authorization to disburse the escrow fund and specifically states the content of the communication, but Plaintiff does not allege what affirmative statements in that communication were false. (Compl. ¶ 64.) Plaintiff also alleges that Defendant "informed the DFI and/or gave the DFI the impression" that the escrow account over which Defendant gained control

contained funds for the purpose of completing real estate transactions. (*Id.* ¶ 71.) While Plaintiff sufficiently alleges that this statement was false, (*id.* ¶ 54), none of the circumstances of the fraudulent communication are clear from Plaintiff's complaint, including whether the statement was in fact ever communicated to the DFI. The court concludes that Plaintiff did sufficiently plead fraud in connection with Defendant's statement to the DFI on April 26, 2000, but cautions that a number of Plaintiff's other allegations would not on their own be sufficient.

### e. Conversion (Count VI)

Plaintiff claims, in Count VI, that by taking control of Old Intercounty/ITI's escrow account, which Defendant knew to contain Plaintiff's funds, and using those funds for its own benefit, Defendant converted in excess of $20 million of Plaintiff's funds. (*Id.* ¶¶ 121-25.) Defendant contends that Plaintiff's allegations are insufficient to state a claim for conversion because Plaintiff has not alleged that the funds were distinct and identifiable or that it was entitled to certain "specific money," and because Plaintiff admits that its funds were "commingled" with other funds in the Old Intercounty/ITI escrow account. (Def. Mem. at 11-13; Def. Reply at 12-13.) Plaintiff notes that its allegations that the monies resided in a specific account and Defendant identified the money belonging to Plaintiff. (Pl. Response at 17.)[20] Plaintiff further contends that it has pleaded the conversion of a specific amount of money, and therefore Defendant's misappropriation of the entire Old Intercounty/ITI account can serve as the basis for a conversion claim. (*Id.*) The court concludes that Plaintiff has not stated a claim for conversion.

In order to state such a claim under Illinois law, a plaintiff must allege "(1) an unauthorized and wrongful assumption for control, dominion, or ownership by a defendant over a plaintiff's personalty;

---

[20]     In arguing that Defendant "could, and did, identify that the specific monies belong to" Plaintiff, (Pl. Response at 17), Plaintiff cites to paragraphs in the complaint that allege, generally, that Defendant knew that the Old Intercounty/ITI escrow account contained Plaintiff's funds. (*See* Compl. ¶¶ 121-23.) The court cannot infer from this general allegation that Defendant identified specific money belonging to Plaintiff.

(2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property." *Fonda v. General Casualty Co. of Ill.*, 279 Ill. App. 3d 894, 899, 665 N.E.2d 439, 442 (1st Dist. 1996) (citing *Gen. Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 886, 565 N.E.2d 93 (1st Dist.1990)). When a claim of conversion concerns money, the money must be capable of being described as a specific chattel; in other words, the plaintiff must have a right to "a specific fund or specific money in coin or bills." *Mid-America Fire & Marine Ins. Co. v. Middleton*, 127 Ill.App.3d 887, 892, 468 N.E.2d 1335, 1339 (4th Dist. 1984). The money is not, however, required to be "specifically earmarked," *In re Thebus*, 108 Ill.2d 255, 260, 483 N.E.2d 1258 (1985), and the fund need not always be a segregated one. *Roderick Dev. Investment Co. v. Community Bank of Edgewater*, 282 Ill. App. 3d 1052, 1062, 668 N.E.2d 1129, 1136 (1st Dist. 1996). The allegedly converted money must, however, be "capable of being described, identified, or segregated in a specific manner." *Prescott v. Allstate Life Ins. Co.*, 341 F. Supp. 2d 1023, 1028 (N.D. Ill. 2004) (citing Bill *Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*, 346 Ill. App. 3d 996, 1003-04, 806 N.E.2d 280, 285 (2d. Dist. 2004)).

Plaintiff admits in its complaint that the funds related to its conversion claim were commingled with other funds held by Old Intercounty/ITI. (Compl. ¶¶ 25-26.) Citing *Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 967-68 (N.D. Ill. 2002), Defendant contends that commingled funds cannot be "distinct and identifiable" such that they are subject to a claim for conversion. (Def. Mem. at 11-12.) In *Shapo*, the plaintiff, a liquidator of an insurance company, sued defendants on a conversion theory for premiums and other monies collected on behalf of the liquidated company. 246 F. Supp. 2d at 967-68. The court found that the liquidator had failed to plead that the money was identifiable and, in fact, had alleged the opposite by admitting that the defendants had commingled the liquidated company's funds with other funds and diverted its finds to other affiliates. *Id.* at 968. The court found the plaintiff's allegations to be clear that the money was "not identifiable or segregated and some is not even in the control of defendants." *Id.* Thus, the *Shapo* court concluded that the plaintiff had not

stated a claim for conversion. *Id.*

In the court's view, *Shapo* does not stand for the broad proposition that whenever funds are commingled they can never be considered identifiable so as to allow a claim for conversion. Such a holding would not comport with the rule that the existence of a specific chattel does not require that funds be kept in a segregated account. *See Roderick Dev. Investment Co.*, 282 Ill. App. 3d at 1062, 668 N.E.2d at 1136 (converted funds from an outside source not unidentifiable because of a failure to segregate). Moreover, the *Shapo* court found that the relevant funds were not identifiable because they were commingled with other funds and because some of the funds were no longer in the defendant's control; nothing in the *Shapo* court's opinion precludes a case of conversion where specific funds are commingled but nevertheless still identifiable. *Id.*

Despite the court's view that Defendant overstates the reach of *Shapo*, Defendant's comparison is not without relevance; like the plaintiff in *Shapo*, Plaintiff here has not alleged that the funds allegedly converted by Defendant are identifiable or otherwise constitute a specific chattel. *Cf. Prescott*, 341 F. Supp. 2d at 1028 (finding the plaintiff's allegations sufficient to survive a motion to dismiss where plaintiffs claimed "that the funds were 'maintained in an identifiable fund' . . . and that the converted funds were 'of a clearly calculable amount capably . . . of being identified.'") While the court draws all reasonable inferences in Plaintiff's favor on a motion to dismiss, the court cannot reasonably infer from Plaintiff's vague and open-ended allegation that "the value of the funds Defendant converted exceeds $20 million," that the funds are identifiable. (Compl. ¶ 125.) Likewise, the court cannot infer that the funds are identifiable or capable of being described from general allegations that Defendant was aware that the Old Intercounty/ITI escrow account contained Plaintiff's funds. Though the court finds the issue to be close, the court concludes that Plaintiff's current allegations do not state a claim for conversion.

### f.    Illinois Title Insurance Act (Count VII)

Plaintiff alleges that it is entitled to damages under the Illinois Title Insurance Act ("ITIA"), 215 ILCS 155/1 *et seq.* Defendant contends that the ITIA only provides for damages to "the person or persons charged for the settlement service involved in the violation"; according to Defendant, Plaintiff does not allege that it or any of its account holders were charged any "settlement services" as a result of Defendant's alleged conduct, therefore Plaintiff has not stated a claim under the ITIA. (Def. Mem. at 13.) Plaintiff disagrees and claims that the basis for its claim is that Defendant used Plaintiff's escrow funds "to settle real estate transactions" insured by Defendant. (Pl. Response at 18.)

In relevant part, the ITIA subjects any person or entity that is regulated under the ITIA to adverse regulatory action if the person or entity "(1) has intentionally made a material misstatement or fraudulent misrepresentation in relation to a matter covered by this Act; [or] (2) has misappropriated or tortiously converted to its own use, or illegally withheld, monies held in a fiduciary capacity . . . ." 215 ILCS 155/21(a).[21] The ITIA further provides that "[a]ny person or persons who violate the prohibitions or limitations of subsection [Section 21(a)] of this Act shall be liable to the person or persons charged for the settlement service involved in the violation for actual damages." 215 ILCS 155/25(a). Plaintiff sues Defendant for actual damages under Section 25. Specifically, Plaintiff alleges that Defendant violated Section 21 of the ITIA, thereby subjecting itself to suit under Section 25, by assuming responsibility for Plaintiff's escrow funds, which were not received "for the purpose of effecting the sale, transfer, encumbrance or lease of real property" in violation of Section 3(8) of the ITIA, and by violating the standards applicable to escrow agents as set forth in Section 17(e)(1).[22]

---

[21]    Plaintiff adequately alleges that Defendant is a regulated entity under the ITIA because it was in the "title insurance business" as a "title insurance company" or "escrow agent" under 215 ILCS 155/3, or it is regulated as an "independent escrowee" under 215 ILCS 155/17. (Compl. ¶ 129.)

[22]    Section 17(e)(1) states that an independent escrowee "may engage in the escrow,
(continued...)

Assuming that Plaintiff has sufficiently alleged that Defendant has violated Section 21(a) so as to general liability under Section 25, the court agrees with Defendant that Plaintiff does not have standing under Section 25. As stated above, Section 25 provides for actual damages to "the person or persons charged for the settlement service involved in the violation." 215 ILCS 155/25(a). Plaintiff poses a creative theory by which Section 25 applies to Defendant's alleged violations here: Plaintiff argues that because Defendant used Plaintiff's funds "to settle real state transactions that had been insured" by Defendant, Plaintiff is indeed the person who was charged for "settlement service involved in the violation."[23] (Pl. Response at 18.)[24] Plaintiff's allegations do not support this theory, however. Plaintiff did not allege that Defendant's use of its funds caused Plaintiff to be charged for "settlement service"; indeed, Plaintiff does not mention that any "settlement service" occurred at any point in its complaint. Nor does Plaintiff direct the court to any particular allegations in its complaint from which the court can draw such an inference. The court finds Plaintiff's allegation that Defendant used Plaintiff's funds to "reduce the claims New Intercounty/[Intercounty National] customers could make against" Defendant insufficient, as it is not reasonable for the court to infer that reducing claims

---

[22](...continued)
settlement, or closing business . . . provided that . . .[f]unds deposited in connection with any escrow, settlement, or closing shall be deposited in a separate fiduciary trust account or accounts in a bank or other financial institution insured by an agency of the federal government unless the instructions provide otherwise. Such funds shall be the property of the person or persons entitled thereto under the provisions of the escrow, settlement, or closing and shall be segregated by escrow, settlement or closing in the records of the independent escrowee. Such funds shall not be subject to any debts of the escrowee and shall be used only in accordance with the terms of the individual escrow, settlement or closing under which the funds were accepted." 217 ILCS 155/17(e)(1).

[23] The ITIA provides that the federal regulations should be relied on to the extent necessary to implement the ITIA. 215 ILCS 155/20. The only applicable definition of "settlement service" in the C.F.R. is "any services provided in connection with a prospective or actual settlement." 24 C.F.R. § 3500.2(b).

[24] The court notes that neither party has cited case law, nor could the court locate any case law in its own review, that sheds light on Section 25's limitation as to who can recover for actual damages.

against "New Intercounty/[Intercounty National] customers" necessarily involved "settlement services." (Compl. ¶ 60.) While the court does not now pass judgment on whether Plaintiff's unique application of Section 25 would indeed render Defendant liable under the ITIA, the court concludes that Plaintiff's complaint fails to put Defendant on "fair notice" of Plaintiff's claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a); *Cler*, 423 F.3d at 729. In fact, but for Plaintiff's brief, which explains Plaintiff's argument as to how Defendant is liable under Section 25(a) of the ITIA, Defendant would not have been aware of Plaintiff's theory that it was effectively charged for settlement services as a result of Defendant's alleged use of Plaintiff's funds. Thus, the court finds that Plaintiff has failed to state a claim for a violation under the ITIA.

### g.    Fraudulent Transfers of Escrow Funds (Counts VIII, IX, and X)

Defendant also contends that Plaintiff has failed to state claims for fraudulent transfers of escrow funds under the IUFTA. Defendant argues that "transfers" under the IUFTA must involve the "property of a debtor," and that Plaintiff has failed to allege that the escrow account transferred was the property of debtors. (Def. Mem. at 14-15.) Plaintiff contends that Defendant's argument is inapplicable to Counts IX and X, which, according to Plaintiff, complain of the transfer of assets other than the escrow account. (Pl. Response at 19.) Plaintiff further argues that it has sufficiently alleged a transfer in Count VIII, because as a fiduciary, Old Intercounty/ITI had an interest in the escrow account that is sufficient for a fraudulent transfer claim, and that Defendant is judicially estopped from arguing otherwise due to its position in *Fidelity National Title Insurance Company of NY v. Howard Savings Bank*, No. 02-C-643, 2003 U.S. Dist. LEXIS 25933, (N.D. Ill. Feb. 11, 2003). (*Id.* at 19-21.) The court concludes that Plaintiff's allegations under the IUFTA are sufficient.

Plaintiff brings its three claims for fraudulent transfer under 740 ILCS 160/5(a)(1), 740 ILCS 160/5(a)(2), and 740 ILCS 160/6, respectively. Each of these provisions requires a "transfer" by a "debtor." 740 ILCS 160/5(a)(1)-(2); 740 ILCS 160/6. The IUFTA defines a "transfer" as "disposing

of or parting with an asset or an interest in an asset." 740 ILCS 160/2(l). An "asset" is "the property of a debtor," and a "debtor" is defined as "a person who is liable on a claim." 740 ILCS 160/2(b), (f). As to each of plaintiff claims under the IUFTA, Plaintiff has alleged that the parties transferring the relevant assets—Hargrove, Old Intercounty, and ITI—were "debtors" within the meaning of the IUFTA. (Compl. ¶¶ 137, 146, 153.) Defendant nevertheless contends that the parties alleged to have fraudulently transferred the escrow funds—Old Intercounty, and ITI—could not have been debtors as a matter of law because the escrow funds transferred to them were not their property but Plaintiff's property. (Def. Mem. at 14.)[25]

Defendant is correct that Plaintiff repeatedly asserts that the escrow funds transferred to Defendant belonged to Plaintiff, (*id.* at 15); but, in the court's view, this is not conclusive as to whether Old Intercounty and ITI were capable of having "transferred" the escrow funds as "debtors" within the meaning of the IUFTA. It is a well-established principle that an escrow agent is not vested with title to the property that it holds in escrow. *See Hoornstra v. United States*, 969 F.2d 530, 533 (7th Cir. 1992) (applying Illinois law); *Albrecht v. Brais*, 324 Ill. App. 3d 188, 191, 754 N.E.2d 396, 399 (3d Dist. 2001); *see also* 715 ILCS 155/16(e) (ITIA provision clarifying that funds in an escrow account are not the property of the escrow agent); 215 155/17(e)(1) (same). Though these cases, cited by Defendant, stand for the principle that an escrow agent does not own the property it holds in escrow, none of these cases were brought under the IUFTA and, in the court's view, they do not preclude that an escrow agent may have sufficient interest in the funds it holds so as to be capable of "transferring" those funds within the meaning of the IUFTA.

The court in *Fidelity National Title Insurance Company of NY v. Howard Savings Bank* held that the escrow agent there, Old Intercounty, had sufficient interest in the assets it transferred for its

---

[25]    To the extent Hargrove is alleged to have transferred assets, those allegations pertain to assets that belonged to Hargrove and not escrow funds, thus the court need not discuss whether Hargrove is a "debtor" capable of transferring assets for the purpose of the IUFTA.

conduct to fall within the IUFTA. 2003 U.S. Dist. LEXIS 25933, at **10-12. In that case, the plaintiff, Fidelity, alleged that Old Intercounty used funds it was holding in escrow for its customers to purchase certificates of deposit and then fraudulently transferred over $7 million in certificates of deposit to the defendant banks. *Id.* at *2. The court was not convinced by the defendants' argument that Old Intercounty had no interest in the property and could not have transferred it under the IUFTA as an "asset"—or "property of the debtor"—because it was stolen. *Id.* at **10-12. In relevant part, the court reasoned that Old Intercounty, as a title insurance agent, was not an ordinary thief with no interest in the assets it transferred. *Id.* at *12. Rather, Old Intercounty was a trustee of the escrow funds with fiduciary obligations to the parties whose funds it held, and with the obligation to make specific disbursements of the funds. *Id.* The court concluded that Old Intercounty had some interest in the assets it transferred and, as a result, that Plaintiff had adequately alleged that Old Intercounty could transfer assets within the meaning of the IUFTA. *Id.* Likewise, the court finds here that Plaintiff has adequately pleaded that Old Intercounty and ITI, as escrow agents, had interest in the escrow funds to as to effect a "transfer" under the IUFTA.[26]

To the extent that Plaintiff's claims for fraudulent transfer relate to Hargrove, Old Intercounty and ITI's transfers of assets *other than* the escrow account, Plaintiff has sufficiently pleaded those claims. Defendant does not dispute that Hargrove, Old Intercounty, and ITI's transfer of assets other than the escrow fund—for example, Hargrove's transfer of certain real estate interests in March of 2000, the transfer of Hargrove's personal assets and other assets of ITI in April of 2000, and Old Intercounty's assignment of real estate interests to Defendant in June of 2000) qualify as "transfers"

---

[26]    The only case Defendant cites that was decided under the IUFTA is *Gregg v. SR Investors, Ltd.*, 966 F.Supp. 746 (N.D. Ill. 1997). Defendant cites *Gregg* for the principal that there can be no cause of action under the IUFTA to recover a debtor's transfer of someone else's property. (Def. Mem. at 14.) *Gregg* addressed a transfer of a personal guarantee on a loan, a different type of property than what is involved here; because the court has concluded that escrow agents have a unique interest in their escrow funds for reasons particular to the function of escrow agents, *Gregg* is not persuasive here.

by "debtors" within the meaning of the IUFTA.  (Compl. ¶¶ 38, 41, 48.)  Plaintiff has stated claims under the IUFTA in Counts VIII, IX and X.

## CONCLUSION

For the reasons explained above, Defendant's motion to dismiss (30) is granted in part and denied in part.  Counts III (fraud), V (Illinois Consumer Fraud), VIII (fraudulent transfer, 740 ILCS 160/5(a)(1)), IX ( fraudulent transfer, 740 ILCS 160/6), X (fraudulent transfer, 740 ILCS 160/5(a)(2)), and XI (unjust enrichment), survive this motion to dismiss.  Counts I (breach of contract), II (breach of fiduciary duty), IV (fraudulent concealment), VI (conversion), and VII (Illinois Title Insurance Act) are dismissed with leave to amend.

ENTER:

Dated: March 30, 2007

_____
REBECCA R. PALLMEYER
United States District Judge