**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INDEPENDENT TRUST CORPORATION, an Illinois Corporation now in receivership, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 05 C 5749 |
| FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, a New York corporation, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

In the 1990s, Jack Hargrove and Laurence Capriotti used a web of companies they controlled to steal tens of millions of dollars from real estate escrowees and other trust beneficiaries. This lawsuit is one of many that arose in the aftermath of their crimes. The Plaintiff, Independent Trust Corporation ("InTrust"), a provider of long-term trust services, was controlled by Hargrove and Capriotti at the time of their theft; it lost more than $68 million of its customers' money due to their actions, and is now in receivership. The Defendant, Fidelity National Title Insurance Company of New York ("Fidelity"), was the reinsurer for numerous real estate escrow accounts that were depleted by Hargrove and Capriotti; in this capacity, Fidelity was liable to compensate the escrowees' insurer after the scheme came to light. In 2000, the Illinois Department of Financial Institutions ("DFI"), which regulates title insurance companies, appointed Fidelity to serve as trustee over the remaining escrow funds, with the sole duty of distributing the remaining money to pay outstanding claims. By doing so, Fidelity also reduced its own liability to the escrowees' insurer.

InTrust filed suit against Fidelity in this court, claiming that Fidelity engaged in fraudulent transfers when it acquired various collateral from Hargrove in 2000 without giving him adequate consideration in return. InTrust subsequently amended its complaint to include allegations that InTrust obtained its trusteeship over the escrow funds by means of misrepresentations and

misleading omissions. InTrust currently claims that Fidelity's actions make it liable to InTrust for: (1) breach of fiduciary duty, (2) common law fraud, (3) fraudulent concealment, (4) Illinois Consumer Fraud Act violations, (5) Illinois Title Insurance Act violations, (6) fraudulent transfers, and (7) unjust enrichment.[1] Fidelity has now moved for summary judgment on the common law and statutory fraud claims, on the fraudulent transfer claims, and on the unjust enrichment claim. Both parties have also filed motions to strike portions of the other side's Local Rule 56.1 filings. For the reasons stated below, the motion for summary judgment is granted, and the motions to strike are stricken as moot.

## BACKGROUND

The following facts are drawn from the parties' Local Rule 56.1 submissions and from the attached exhibits. The facts are recounted in the light most favorable to InTrust.

### I.  The Hargrove and Capriotti Fraud

From 1990 through 2000, Jack Hargrove and Laurence Capriotti stole at least $98 million from the beneficiaries of escrow accounts. (LR 56.1 ¶ 30.) Much of this money was stolen from real estate escrowees, who had placed their money in trust with a family of companies controlled by Hargrove and Capriotti; two of these companies were Intercounty Title Company of Illinois ("Old Intercounty") and Intercounty Title Company ("New Intercounty"). (LR 56.1 ¶¶ 6, 10, 20, 28-30; LR 56.1 Resp. ¶¶ 20, 28; LR 56.1 Add'l Resp. ¶ 4.) Hargrove and Capriotti concealed their activities by commingling the escrowees' funds in large combined accounts, and by "lapping" the funds—that is, by paying out money owed to earlier escrowees with funds obtained from later escrowees. (LR 56.1 ¶ 31.)

---

[1]     InTrust previously alleged additional counts of breach of contract and conversion. These counts were dismissed by the court in March 2007. *Indep. Trust Corp. v. Fid. Nat'l Title Ins.*, No. 05 C 5749, 2007 WL 1017858, at *28 (N.D. Ill. Mar. 30, 2007). By the same order, the court dismissed InTrust's claims of breach of fiduciary duty, fraudulent concealment, and Title Insurance Act violations. *Id.* InTrust then realleged the latter claims in its Second Amended Complaint.

Not surprisingly, the theft of escrowee funds at times left the escrow account underfunded, and the trust accounts were sometimes drawn down into negative balances in order to permit payment of sums owed to escrowees.  (*See* LR 56.1 ¶ 32.)  In order to keep their scheme from coming to light, Hargrove and Capriotti caused InTrust, which they also controlled, to transfer tens of millions of dollars into the Intercounty escrow accounts.  (LR 56.1 ¶¶ 12-13, 33.)  Most of that money was taken from individual retirement trusts that were being managed by Intrust as trustee.  (*See* LR 56.1 Add'l ¶ 1.)

The money taken from InTrust was transferred into three different bank accounts.  The first account ("the First LaSalle Account") was maintained by Old Intercounty at LaSalle National Bank, under account number 2132728.  (LR 56.1 ¶ 8; LR 56.1 Add'l ¶ 5.)  InTrust deposited a net amount of more than $41 million into this account, and it never recovered that money.  (LR 56.1 ¶ 14.)  Old Intercounty ceased doing in business in January 1996, but InTrust contends that the First LaSalle Account remained active until 1999.  (LR 56.1 ¶¶ 16-17; LR 56.1 Add'l ¶ 7.)

According to Fidelity, the second account ("the Second LaSalle Account") was opened by New Intercounty[2] in 1995 at LaSalle National Bank, under account number 5800017427.  (LR 56.1 Add'l Resp. ¶ 5.)  Fidelity maintains that no escrow funds were transferred from the First LaSalle Account into the Second LaSalle Account; InTrust disputes this, contending that someone transferred $100 million from the first account to the second between 1995 and 1997.  (LR 56.1 ¶ 26; LR 56.1 Resp. ¶ 26.)  After the Second LaSalle Account ran down into negative balances in early April 1999, Capriotti and Hargrove caused InTrust to transfer $9.2 million into it, in order to conceal the shortfall.  (LR 56.1 ¶¶ 32-33.)  InTrust does not contend that any of its funds were

---

[2] Both of the parties agree that the account was opened in 1995.  Fidelity maintains that New Intercounty opened the account.  (LR 56.1 Add'l Resp. ¶ 5.)  InTrust contends that the account was opened by "Old Intercounty, ITI, and/or New Intercounty" in 1995, but cites, in support of this contention, only Fidelity's admission in its answer to the Second Amended Complaint that New Intercounty opened the account.  (LR 56.1 Add'l ¶ 5; Ans. to 2d Am. Compl. [76] ¶ 23.)

transferred into accounts controlled by Hargrove, Capriotti, Old Intercounty, or New Intercounty after April 1999. The Second LaSalle Account was closed on approximately September 30, 1999. (LR 56.1 ¶ 36.)

The third escrow account was located at Harris Bank with account number 300-615-2. (LR 56.1 Add'l ¶ 8.) According to Fidelity, the Harris Account was opened in the fall of 1999.[3] (LR 56.1 Add'l Resp. ¶8.) InTrust contends that, before closing the Second LaSalle Account, "Old Intercounty and/or ITI" transferred all of the funds remaining in that account—over $20 million—into the Harris Account; Fidelity disputes this, complaining that InTrust has failed to adduce proper evidence of such a transfer. (LR 56.1 Add'l ¶ 8; LR 56.1 Add'l Resp. ¶ 8.) Regardless, it is undisputed that the Harris account was depleted and ran a negative balance from January 3, 2000 through January 13, 2000. (LR 56.1 Resp. ¶¶ 37-38.) Fidelity contends that InTrust did not make any deposits into the account from January 14, 2000 through April 26, 2000, and InTrust does not dispute this. (LR 56.1 ¶ 39; LR 56.1 Resp. ¶ 39..)

On April 14, 2000, the Illinois Commissioner of Banks and Real Estate took control of InTrust and placed it in receivership. (Ans. to 2d Am. Compl. ¶ 12.) The Commissioner appointed PricewaterhouseCoopers ("the Receiver") for the purpose of liquidating InTrust and satisfying its debts. (*Id.* ¶ 13.) In total, between 1990 and 2000, InTrust deposited a net amount in excess of $68 million (including accrued interest) into escrow accounts controlled by Old Intercounty and New Intercounty. (LR 56.1 Add'l ¶ 2.) This money was never returned: InTrust secured a $50 million judgment against Hargrove as well as a $68 million judgment against Capriotti, ITI, and Old Intercounty, but it claims that neither of these judgments has been satisfied.[4] (LR 56.1 Add'l ¶ 12;

---

[3] As this contention was made in a response to InTrust's additional statement of facts, InTrust has neither admitted nor disputed it.

[4] The evidence cited by InTrust in support of its contention that the judgments were never satisfied shows only that the judgments existed, not that they were not paid. (J. Against
(continued...)

4

LR 56.1 Add'l Resp. 12.) Capriotti pleaded guilty to four counts of fraud in federal court on July 14, 2005. *United States v. Capriotti*, 03 CR 779-1 (N.D. Ill. Jul. 14, 2005) (minute order entering Capriotti's guilty plea). Hargrove was convicted by a federal jury of ten counts, including mail fraud, wire fraud, and tax fraud, on September 15, 2005. *Id.* Capriotti's plea agreement, and the jury's findings against Hargrove, establish that the two participated in a scheme to defraud InTrust and its account holders. *Id.* Following the guilty plea and the conviction, Hargrove and Capriotti were each sentenced to fourteen years in prison. *Id.*

### III.    The Hargrove Collateral Agreements

Intercounty National Title Insurance Company ("INTIC") was formed in 1995 under the nominal ownership of two former Old Intercounty officers, Susan Peloza and Terry Cornell, but it was actually under the control of Hargrove and Capriotti.  (LR 56.1 ¶18; LR 56.1 Add'l ¶ 4.) Hargrove and Capriotti also owned ITI Enterprises, Inc. ("ITI"), which contracted with INTIC and New Intercounty in 1995 to provide "title, closing, and escrow services." (LR 56.1 Add'l ¶ 4.) Under this contract, INTIC acted as underwriter for the escrow accounts that were managed by ITI as agent for New Intercounty.  (LR 56.1 ¶ 23; LR 56.1 Add'l ¶ 4.)

Fidelity is an underwriter of title insurance and a reinsurer of title insurance policies underwritten by others.  (LR 56.1¶ 3.) Fidelity entered into a reinsurance agreement with INTIC in 1995, under which it was obligated to reinsure policies issued by INTIC.  (LR 56.1 ¶ 21.) Specifically, Fidelity agreed to reimburse INTIC for any losses INTIC sustained on its policies beyond a fixed threshold (initially set at $2500).  (LR 56.1 ¶ 21; Reinsurance Agreement at 1, Ex. 14 to LR 56.1.)

---

[4](...continued)
Hargrove, 11/17/06, Ex. 114 to LR 56.1 Add'l; Ans. to 2d Am. Compl. ¶ 76.)  Fidelity admits, however, that the net amount of $41 million transferred into the First LaSalle Account was either taken by Hargrove and Capriotti, or used to fund escrow shortfalls created by their prior thefts of trust deposits, rather than being returned to InTrust.  (LR 56.1 ¶ 15.)

In early March 2000, Fidelity learned that there was a shortfall in the Harris Account. (LR 56.1 ¶ 40.) Later that month, New Intercounty represented (via an unidentified individual) that the shortfall was between $8 million and $10 million. (*Id.*) On March 17, 2000, Fidelity entered into an agreement with Hargrove ("the Hargrove I Agreement"), in which Hargrove pledged certain collateral to Fidelity in exchange for a partial release of liability to Fidelity relating to the shortfall.[5] (LR 56.1 ¶ 42.) This partial release provided that Hargove would not be liable to Fidelity for any damages up to the value of the collateral plus $2,033,194.86, an amount that Hargrove had deposited in the account to reduce the shortfall. (LR 56.1 ¶ 42.) Despite this facial equivalency, InTrust disputes that the partial release was of reasonably equivalent value to the pledged collateral. (LR 56.1 Resp. ¶ 42.)

On April 20, 2000, Fidelity's auditors reported that the Harris Account shortfall was between $47.8 and $55.9 million. (LR 56.1 ¶ 44.) Fidelity terminated its reinsurance agreement with INTIC the next day. (LR 56.1 ¶ 45.) In response, Hargrove represented to Fidelity that the shortfall was not as large as Fidelity believed, and offered additional collateral. (LR 56.1 ¶ 46.) Within days, Fidelity agreed to reinstate its reinsurance agreement with INTIC. (LR 56.1 ¶ 47.)

Hargrove pledged additional collateral to Fidelity in two agreements. (LR 56.1 ¶ 48.) An April 26, 2000 agreement ("the Hargrove II Agreement") pledged to Fidelity interests in identified real estate parcels in the Ruffled Feathers Country Club, a 122-foot yacht named "Alexis," two apartment complexes, two limousines, and a credit reporting agency. (LR 56.1 ¶¶ 48-50; Hargrove II Agreement at 1-2, Ex. 40 to LR 56.1.) As before, Fidelity agreed in exchange to release Hargrove from any liability in connection with the escrow shortfalls "to the extent of the actual, realized value of the collateral . . . ." (Hargrove II Agreement at 4.) Fidelity also promised that it would renew its

---

[5]     The parties have not discussed the legal basis for Hargrove's liability to Fidelity. As discussed in more detail below, Fidelity subsequently obtained a judgment against Hargrove for breach of fiduciary duty and Illinois Title Insurance Act violations. (LR 56.1 ¶ 58.)

reinsurance agreement with INTIC for a five-year period. (Hargrove II Agreement at 1.) Later, in a May 23, 2000 "Supplement to the 'Hargrove Letter' . . . and the 'Second Hargrove Agreement'" ("the Hargrove III Agreement"), Hargrove agreed, in addition, to provide Fidelity with the proceeds from the sale of certain real estate as additional collateral. (LR 56.1 ¶ 52; Hargrove III Letter at 1, Ex. 41 to LR 56.1.)

By these three agreements, Hargrove pledged more than $10 million worth of assets to Fidelity. (LR 56.1 Add'l ¶ 39.) Fidelity has already recovered more than $8 million from these transfers, and is attempting to derive further value from the remaining assets. (*Id.*) None of this recovery has been shared with InTrust. (*Id.*) At the time these agreements were executed, Fidelity had not yet asserted any claims against Hargrove. (*Id.* ¶ 41.)

InTrust contends that Fidelity did not provide any commensurate value to Hargrove in exchange for the pledged collateral. (LR 56.1 Add'l ¶ 40, 42.) In support of this contention, it cites the agreements themselves, as well as an expert report by Mark J. Hosfield.[6] Hosfield opined that the release represented "purported value to Hargrove" because "as an economic matter, . . . [Fidelity's] claim would have to be reduced by the value of the collateral that Hargrove pledged regardless of this agreement." (Hosfield Rep. at 14, Ex. 83 to LR 56.1 Add'l.) He added that he was not aware "of any value provided by Fidelity for the value of the assets it received." (*Id.* at 14.) He noted that although Fidelity had agreed to extend the reinsurance agreement with INTIC, it in fact terminated that agreement on June 23, 2000.[7] (*Id.* at 15.) He concluded that Fidelity had not

---

[6]     Hosfield is a Certified Public Accountant and a Certified Management Accountant, who was a partner at Arthur Andersen and KPMG before starting a consulting business. (Hosfield Curriculum Vitae at 1, Ex. 1 to Hosfield Rep.) He has a bachelor's degree in Secondary Education, with a teaching minor in Physics, from the University of Illinois, and a Masters in Management from the Kellogg School of Management at Northwestern University. (*Id.*) He has also taken accounting course work at Southern Illinois University at Edwardsville. (*Id.*) He has no legal training or work experience. (*Id.* at 1-2.)

[7]     Fidelity did pay on its prior reinsurance obligations; presumably, the cancellation
(continued...)

provided reasonably equivalent value in exchange for the collateral pledged to it by Hargrove. (*Id.*)

Edwin Thomas is an attorney at Bell, Boyd and Lloyd in Chicago, who represented Fidelity in its dealings with Hargrove in March 2000. (Thomas Test. at 1483-84, Ex. 80 to LR 56.1 Add'l.) Thomas testified in a lawsuit brought by Fidelity against INTIC in 2004, explaining that he had been working to acquire collateral from Hargrove on Fidelity's behalf. (Thomas Test. at 1494.) When asked whether Hargrove had informed him of his motives in turning over the collateral, Thomas testified that he had been concerned "about . . . having an agreement with consideration that would be enforceable," and that he had added some language to the agreement in order to generate consideration because "it looked like [Hargrove] was a bystander to it . . . ."[8] (Thomas Test. at 1559-60.)

In September 2000, Fidelity sued Hargrove for conversion, breach of fiduciary duty, and violation of the Illinois Title Insurance Act. (LR 56.1 ¶ 54.) The suit went to trial in the Northern District of Illinois before the Honorable Samuel Der-Yeghiayan, and the jury was instructed that Hargrove had asserted, as an affirmative defense, a partial release from Fidelity. (LR 56.1 ¶ 56.) The verdict form instructed the jurors that, if they found that Hargrove had been released, it should reduce any damages accordingly. (LR 56.1 ¶ 57; Verdict Form at 7-8, Ex. 55 to LR 56.1.) Although the jury found in Fidelity's favor on the fiduciary duty and Title Insurance Act claims, it awarded only $1.5 million for the former claim and nothing for the latter. (LR 56.1 ¶ 58.) The verdict forms, however, do not indicate whether the jury had relied upon the release to reduce its damage award. (Verdict Form at 7-8.) The jury also found against Fidelity on its claims against Stewart Title

---

[7](...continued)
means only that Fidelity refused to reinsure new escrow accounts created by INTIC after that date. No such new accounts existed, however, because June 23 was also the day that the DFI shut down INTIC. (*See* LR 56.1 ¶¶ 81-82.)

[8]        This testimony is somewhat opaque; presumably, Thomas meant that an earlier version of the Hargrove I Agreement lacked language releasing Hargrove from liability, and that he added that language in order to ensure that the pledge of collateral would be enforceable.

Guaranty Company ("STG")[9], and Fidelity appealed this ruling. *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748 (7th Cir. 2005). There was no cross-appeal by any of the defendants, including Hargrove. *Id.* The Seventh Circuit vacated the verdict due to evidentiary errors, and remanded for a new trial. *Id.* at 753-54. Even though Hargrove did not appeal the judgment against him, Fidelity asserted in the subsequent litigation that the Seventh Circuit had reversed its judgment against Hargrove. *See, e.g.*, Mot. for Initial Status Conf. ¶ 6, in *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Co.*, No. 00 C 5658, Docket Entry No. 782 (N.D. Ill. Mar. 8, 2006) (asserting that the Seventh Circuit had "reversed the judgment entered on Fidelity's claims against . . . Jack Hargrove"). Hargrove, who was sentenced to serve fourteen years in a federal penitentiary shortly after the remand, has declined to defend himself in the subsequent proceedings, and Fidelity has since moved for a default judgment against him. Mot. for Default J. ¶¶ 1-2, 11, in *Fid. Nat'l*, No. 00 C 5658, Docket Entry No. 920 (Aug. 6, 2008).

**IV.    Fidelity Becomes Trustee of the Harris Account Funds**

As discussed above, Fidelity learned of the escrow shortfall, and began to investigate it, in early March 2000. Sometime that month, the president of New Intercounty, Robert Martos, orally informed Fidelity auditor Paul Hunsinger of a potential transfer from InTrust to New Intercounty of $9.2 million, although he did not provide any documentation of this. (LR 56.1 ¶¶ 66-67.) In a status report written on April 20, 2002, Fidelity's internal auditors noted this "potential transfer." (LR 56.1 Add'l ¶ 45; Status Report at 1, Ex. 1 to LR 56.1 Add'l.)

At this time, as recounted above, Fidelity was negotiating with Hargrove and INTIC regarding the possibility of reinstituting the reinsurance contract. In connection with these negotiations, Fidelity informed the DFI on April 24, 2000 that "an important element" of any such agreement would be "Fidelity's appointment [by the DFI] to oversee and control existing escrow

---

[9]    STG was another title insurer, which had used Old Intercounty as an agent for the purpose of providing title insurance policies. (LR 56.1 ¶ 7.)

accounts." (LR 56.1 Add'l ¶ 20.) Fidelity also informed the DFI, via a letter from its Senior Vice President, Thomas Simonton, that it planned to "control, monitor, and oversee all aspects" of the Harris Account. (Letter from Simonton to Vega, 4/26/00, at 1, Ex. 30G to LR 56.1 Add'l.) Simonton opined that "the magnitude of the escrow account make it unfeasible to do a total accounting of all its activity over a sufficient period of time."[10] (*Id.*) Instead, he wrote:

> [A] more accurate and cost-effective determination of any escrow shortfall can be made by closing the old account and opening a new one. . . . In the meantime, Fidelity will fund the obligations of Fidelity, [New Intercounty], and INTIC to INTIC's insureds (the consumers themselves) pursuant to its reinsurance agreement . . . .

(*Id.*)

On April 26, New Intercounty and INTIC transferred control over the Harris Account to Fidelity. (LR 56.1 Add'l ¶ 20.) As of April 28, 2000, the closing balance in this account was $19.7 million. (LR 56.1 Add'l Resp. ¶ 20; Harris Account Statement at 12468, Ex. 84 to LR 56.1 Add'l.) Over the next two months, Fidelity deposited more than $16 million of its own funds into the Harris Account in order to cover escrow shortages. (LR 56.1 Add'l ¶ 22.) Although Fidelity deposited money in order to keep a positive balance on the account, it did not use its control over the Harris Account to prevent escrowees from withdrawing more than a *pro rata* share of the total account balance. (LR 56.1 Add'l ¶ 24.)

Fidelity hired Deloitte & Touche to further investigate the escrow shortfall on May 15, 2000. (LR 56.1 ¶ 71.) On June 19, 2000, Deloitte produced a draft report stating that "$9.2 million may have been transferred inappropriately from InTrust to fund a deficit in the [New Intercounty] Master Escrow account." (Deloitte Rep. at 2169, Ex. 3 to LR 56.1 Add'l.) Fidelity did not disclose this information to the Receiver. (LR 56.1 Add'l ¶ 29.)

---

[10] InTrust contends that this statement was false, and that Simonton used it to prevent the DFI from learning of InTrust's interest in the account. (LR 56.1 Add'l ¶ 27.) It cites no evidence demonstrating that a full accounting would have been manageable, however, or showing that Simonton had any improper intent. (*Id.* ¶¶ 27, 31.)

On June 20, 2000, Fidelity's outside counsel, Edwin Thomas; its general counsel, Alan Stinson; and Deloitte partner Don Svendson met with representatives from the DFI, including DFI Director Sara Vega, DFI Chief Counsel Elizabeth Byrne, and DFI employee Carl LaSusa. (LR 56.1 ¶ 73.) At this meeting, Fidelity informed the DFI representatives of the preliminary results of Deloitte's investigation. (LR 56.1 ¶ 74.) Thomas asserts that he provided a copy of the June 19 Deloitte Report to the DFI at this meeting, and that he told the DFI's representative about the InTrust deposits, telling them that the deposits "smacked of criminality." (Thomas Dep. at 232:9-19, Ex. 6 to LR 56.1.) InTrust disputes this testimony, but relies primarily on the affidavit of Henry Stirmell, a DFI Supervisor who was not present at the meeting. (LR 56.1 Resp. ¶ 74.) Stirmell swears that "to his knowledge," Fidelity never gave the DFI a copy of the Deloitte Report, and that Thomas never spoke to him regarding the InTrust transfer. (Stirmell Aff. ¶¶ 24-28, 30, Ex. 30 to LR 56.1 Add'l.) The DFI has not produced any audit reports in connection with this litigation, and Stirmell claims it has no such documents in its possession. (LR 56.1 Add'l ¶ 30.)

The rest of InTrust's evidence that Thomas did not bring up the $9.2 million deposit is similarly equivocal. Both LaSusa and Byrne took handwritten notes at the meeting, but neither set of notes mentions the InTrust deposit. (LR 56.1 Add'l ¶ 28.) When deposed in August 2007, Svendson testified that he did not remember whether anyone had discussed InTrust at the June 2000 meeting. (Svendson Dep. at 40:4-20.) Byrne, when deposed in December 2002, testified that she "had not been informed" of any commingling of InTrust and INTIC escrow funds. (Byrne Dep. at 44:8-18, Ex. 51 to LR 56.1 Add'l.) Unfortunately, the contextual time frame for this statement is unclear; Byrne was testifying to her lack of knowledge prior to being informed by LaSusa that commingling was taking place, but she could not remember when LaSusa had first informed her. (Byrne Dep. at 43:1-6.) Byrne was not asked whether Thomas had discussed InTrust at the June 20, 2000 meeting nor whether the DFI was given a copy of the Deloitte Report at that meeting. Nor has InTrust provided testimony from Vega or LaSusa on this point. (LR 56.1 Resp. ¶ 74.)

The day after the June 20 meeting with the DFI, Thomas, Sadowski, and Svendson met with representatives from the Department of Justice, the Federal Bureau of Investigation, and the Internal Revenue Service. (LR 56.1 ¶ 76.) At this meeting, they described Deloitte's preliminary findings. (LR 56.1 ¶ 76.) InTrust does not dispute that the information provided included a reference to the $9.2 million InTrust deposit. (LR 56.1 Resp. ¶ 76.)

The DFI ordered that INTIC stop doing business, effective June 23, 2000, and appointed Fidelity as trustee over INTIC's escrow accounts on June 26, 2000. (LR 56.1 ¶¶ 81-82.) InTrust contends that the DFI would not have authorized Fidelity to act as trustee over the Harris Account if it had known that the account contained funds outside of its purview, and that the DFI in fact had no power to take this action. (LR 56.1 Add'l ¶ 26.) In support of this contention, it cites only the deposition testimony of DFI Director Vega, who stated that InTrust was not an entity regulated by the DFI, and that the DFI accordingly had no responsibility to investigate potential misconduct by InTrust. (Vega Dep. at 248:23-249:9, Ex. 69 to LR 56.1 Add'l.) No support is provided for the central contention, that the DFI cannot or would not have authorized Fidelity to act as a trustee over an account that contained funds misappropriated from entities the DFI did not regulate.

After becoming trustee over the Harris Account, Fidelity wound it down, transferring approximately $13.5 million into a new account at the Bank of America by July 26, 2000. (LR 56.1 Add'l. ¶ 27.) On August 30, 2000, the DFI authorized Fidelity to disburse the $13.5 million in the Bank of America Account. (LR 56.1 Add'l. ¶ 27.) Fidelity agreed to pay "all remaining verifiable claims, made or to be made, which are based on funds deposited in escrow with Intercounty or its agents, pursuant to escrow instructions, for the purpose of completing bona fide . . . real estate transactions, which transactions remained uncompleted . . . as of 5 p.m. June 23, 2000 . . . ." (Agreement at 3596, Ex. 62 to LR 56.1.) In a letter to the DFI in early September, Thomas stated that "Fidelity's only goal has been to wind down Intercounty as quickly as possible and satisfy its obligations as reinsurer. Fidelity has now undertaken the additional obligation to satisfy all claims

to the escrow, in full."[11]  (Letter from Thomas to Byrne at 1-2, Ex. 29 to LR 56.1 Add'l. at 042939.) Fidelity admits that its reinsurance liability was reduced by its ability to use the $13.5 million in the Harris Account to pay out existing claims.  (LR 56.1 Add'l Resp. ¶ 27.)

InTrust admits that it did not learn of any of Fidelity's statements to the DFI until 2004 or 2005.  (LR 56.1 Resp. ¶ 91.)

## V.      InTrust's Knowledge Regarding the Loss of Its Deposits

In 1999, InTrust's President, Gary Bertacchi, repeatedly asked Old Intercounty to return InTrust's deposits, without success.  (LR 56.1 ¶ 94.)  By June 1999, Bertacchi articulated his suspicion that the InTrust funds had been misappropriated.  (LR 56.1 ¶ 95.)  In August of that year, he learned that InTrust had transferred most of its banking activity away from LaSalle.  (LR 56.1 ¶ 96.)  In February of 2000, Hargrove told him that there was a "hole" in the escrow account where InTrust's money should have been.  (LR 56.1 ¶ 97.)

During the fall of 1999, InTrust was repeatedly ordered by the Illinois Office of Banking and Real Estate ("OBRE") to regain control of its trust funds from New Intercounty.  (LR 56.1 ¶ 98.)  On March 1, 2000, the OBRE ordered InTrust to recover its money using "every available means."  (LR 56.1 ¶ 99.)  At this time, InTrust retained counsel to represent it in an attempt to recover its funds. (LR 56.1 ¶ 100.)  Finally, on April 12, 2000, the OBRE took control of InTrust, and appointed the Receiver to liquidate it two days later.  (LR 56.1 ¶¶ 101-02.)

One of the Receiver's duties was to locate all of InTrust's trust assets.  (LR 56.1 ¶ 104.) During the Spring of 2000, the Receiver attempted to determine the fate of the $68 million that InTrust had deposited with Old Intercounty and ITI.  (LR 56.1 Add'l ¶ 47.)  In connection with this investigation, the Receiver reviewed InTrust's records, and sought records from Old Intercounty and relevant banking institutions.  (LR 56.1 ¶ 104.)

---

[11]      Once again, InTrust contends, without citing further evidence, that this statement was false.  (LR 56.1 Add'l ¶¶ 27, 32.)

As early as April or May 2000, the Receiver knew that $9.2 million of InTrust's trust assets had been deposited into the Second LaSalle Account in April 1999, and that it had been immediately transferred out of that account. (LR 56.1 ¶ 105.) The Receiver had completed its review of InTrust records relating to transfers to and from Old Intercounty by June 1, 2000. (LR 56.1 ¶ 104.) Believing that Hargrove and Capriotti had stolen $68 million from InTrust, the Receiver sued them, Old Intercounty, ITI, and others in Illinois chancery court on June 1, 2000. (LR 56. Add'l ¶ 47; 2d Am. Compl. [76] ¶ 76.) The Receiver served a subpoena on LaSalle Bank on July 7, 2000, seeking to determine the location of InTrust's funds. (LR 56.1 ¶ 106.)

On August 18, 2000, the Receiver prepared a report discussing the InTrust matter. (LR 56.1 ¶ 111.) In that report, the Receiver noted that the $9.2 million deposit had been transferred from InTrust to Old Intercounty, and from Old Intercounty to New Intercounty. (*Id.*) Furthermore, the Receiver noted that the $9.2 million appeared to have ended up in New Intercounty's primary escrow account. (*Id.*)

By May 2000, the Receiver reviewed an e-mail written by Bertacchi, dated September 1999, in which Bertacchi stated his belief that the Intercounty accounts had been moved from LaSalle to Harris bank. (LR 56.1 ¶ 114.) Also at that time, a federal grand jury served a subpoena upon InTrust, seeking information in connection with a money laundering investigation of Old Intercounty; the subpoena listed several accounts involved in the Old Intercounty fraud, including the two LaSalle Accounts and the Harris Account. (LR 56.1 ¶ 114; Grand Jury Subpoena at 41215, Ex. 123 to LR 56.1.) In connection with its suit against Capriotti, the Receiver served a subpoena upon Harris Bank, seeking information about New Intercounty's escrow accounts there, on July 7, 2000. (LR 56.1 ¶ 115.) The Receiver knew that the balance in the Second LaSalle Account had been moved to the Harris Account no later than October 17, 2000, when its employee Charles Wilson reviewed a 1999 letter from an Old Intercounty employee directing LaSalle to transfer the balance

of the former account to the latter.[12]  (LR 56.1 ¶ 116; Wilson Dep. at 174:12-175:11.)

Fidelity's role in disbursing funds from the Harris Account was widely reported in the Chicago media, beginning with a *Chicago Sun-Times* article on June 30, 2000, and continuing with other press reports through the rest of the summer.  (See LR 56.1 ¶ 117 (collecting articles).)  InTrust admits that the Receiver's employees would "frequently circulate articles" discussing the Intercounty entities.  (LR 56.1 Resp. ¶ 117.)  One such article circulated among the Receiver's employees was a *Daily Southtown* article, published on August 31, 2000, titled "Fidelity to Settle Claims: Nation's Largest Insurer of Title Agrees to Pay Another $19 Million."[13]  (LR 56.1 ¶ 31; Nolan Article, 8/31/08, Ex. 131 to LR 56.1.)  According to this article, "Fidelity was appointed trustee of [INTIC] in June . . . ."  (Nolan Article, 8/31/08, at 1.)

On September 18, 2000, InTrust received a copy of the Complaint filed by Fidelity in its federal lawsuit against INTIC.  (LR 56.1 ¶ 118.)  Review of this complaint made the Receiver aware of Fidelity's involvement with New Intercounty's escrow accounts.  (*Id.*)  One of the Receiver's employees, Brian Wilson, testified that the complaint put the Receiver's employees on notice that Fidelity "had control over the same escrow account that our $9.2 million had ultimately ended up in."  (LR 56.1 ¶ 119.)  InTrust disputes that review of the complaint could have given it knowledge of "Fidelity's misuse, misappropriation and/or unjust enrichment with respect to the escrow funds,"

---

[12]     InTrust admits reviewing this letter at this time, and although it denies that reviewing the letter could constitute "discovery" for the purpose of the statute of limitations, it does not deny that at this point, it knew that the LaSalle Account balance had been moved to the Harris Account. (LR 56.1 Resp. ¶ 116.)

[13]     Fidelity's evidence in support of its contention is an e-mail from Brian Wilson, a Receiver employee, forwarding two unidentified *Daily Southtown* articles, dated 8/31/00, one of which "talks about Fidelity bringing foreclosure proceedings on . . . Hargrove's properties." (Email from Wilson, 9/1/00, Ex. 133 to LR 56.1) The Nolan article did, in fact, discuss Fidelity's attempts to foreclose on properties pledged by Hargrove as collateral. (Nolan Article at 2.)  Disputing this contention, InTrust argues that "Fidelity has not established that any particular article was reviewed" by the Receiver's counsel or employees.  (LR 56.1 Add'l ¶ 117.)  InTrust cites no evidence in support of its denial, however.

but it does not deny that the complaint revealed that Fidelity had control over the Harris Account. (LR 56.1 Resp. ¶ 119.)

InTrust admits that, before October 24, 2000, Kirkland & Ellis LLP, the Receiver's former counsel, created an outline of potential claims against Fidelity, which included both fraudulent transfer claims based on the Hargrove Asset Transfers and a suit based on Fidelity's assumption of control over the escrow funds. (LR 56.1 Resp. ¶ 125.) At meetings in November and December 2000, Receiver employees met with Kirkland attorneys to discuss the possibility of suing Fidelity.[14] (LR 56.1 ¶ 126.) In December 2000, the Receiver finally obtained the Harris Account statements from Harris Bank. (LR 56.1 Add'l ¶ 57.)

InTrust contends that Fidelity "concealed the fact that InTrust's money had been transferred into the Harris Escrow Account . . ." when it responded to InTrust's subpoenas in connection with InTrust's suit against Hargrove and Capriotti in chancery court. (LR 56.1 Add'l ¶ 47.) In support of this contention, it cites its own response to one of Fidelity's interrogatories,[15] in which it argued that "Fidelity raised frivolous objections to producing responsive documents and withheld documents under an inappropriate claim of consultant work product." (*Id.* ¶ 47; InTrust 2d Interrog. Supp. Resp. ¶ 3, Ex. 38 to LR 56.1 Add'l.) InTrust contends that Fidelity inappropriately delayed responding to subpoenas and orders compelling production, made "false promises" to produce documents by certain dates, and engaged in other discovery-related misconduct. (LR 56.1 Add'l ¶¶ 48-50, 52-56.)

In February 2001, also in connection with the suit in chancery court, Fidelity argued that the Deloitte report was protected by a consultant work-product privilege. (Fidelity's Resp. to Intrust's

---

[14]    InTrust does not explain why the Receiver then waited until 2005 to sue Fidelity.

[15]    The interrogatory in question asked InTrust to state when it learned of its injuries and of their wrongful cause; it also asked for any facts or document relating to that knowledge. (InTrust 2d Interrog. Supp. Resp. ¶ 3.)

Motion to Compel at 4-6, Ex. 26L to LR 56.1 Add'l.)  InTrust contends that this argument incorporated a misrepresentation because as Fidelity acknowledges, it provided the report to the state and federal governments, thus waiving the privilege.  (LR 56.1 Add'l ¶ 51.)  InTrust contends that it did not receive certain documents that "demonstrat[ed] the fraudulent statements [Fidelity] had made to the DFI to gain control of the escrow funds" until 2004 or 2005, when they were produced by a third party in another case.  (LR 56.1 Add'l ¶ 58.)

## VI.    Procedural History

On April 9, 2004, at InTrust's request, Fidelity and InTrust entered into a tolling agreement, which tolled the statute of limitations on certain claims by InTrust against Fidelity from April 9, 2004 to June 30, 2004.  (LR 56.1 ¶ 132.)  Subsequent agreements extended the tolling period until June 30, 2004, and then again to September 30, 2005.  (LR 56.1 ¶¶ 134-136.)  InTrust first sued Fidelity in this court on June 30, 2004, but then voluntarily dismissed its complaint on September 3, 2004. (LR 56.1 ¶¶ 133, 135.)  On September 30, 2005 (the last day of the agreed-upon tolling period), InTrust moved this court to permit it to amend its previously dismissed complaint against Fidelity; the motion bore the same caption and case number as the prior complaint.  (LR 56.1 ¶ 137.)  *See* Docket Entry No. 7 in *Indep. Tr. Corp. v. Fid. Nat'l Title Ins. Co.*, No. 04 C 4381 (N.D. Ill. Sept. 30, 2004).  The court denied the motion, and InTrust then filed a new complaint on October 5, 2005, initiating the present action.  (LR 56.1 ¶¶137-38.)  *See* Docket Entry No. 9 in *Indep. Tr.* (N.D. Ill. Oct. 6, 2005).

Fidelity's initial Complaint, filed on October 5, 2005, contained only a single count, alleging violations of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.*  (Compl. [1] at ¶¶ 38-45.)  The complaint stated that, during the first half of 2000, Hargrove, Old Intercounty, and ITI transferred millions of dollars in assets to Fidelity.  (*Id.* ¶ 42.)  In addition to the assets transferred by the three Hargrove Agreements, which were described in some detail, the Complaint also alleged the following:

Hargrove, Old Intercounty, and ITI may have transferred other assets to Fidelity, which transfers were also fraudulent or otherwise improper under Illinois law. Moreover, other persons who were debtors to InTrust may also have transferred assets to Fidelity. Such additional transfers may also have been fraudulent or otherwise improper under Illinois law.

(*Id.* ¶ 33.) The Complaint also referred to Fidelity's role as trustee of New Intercounty's escrow account. (*Id.* ¶ 34.)

On June 30, 2006, InTrust filed an Amended Complaint. (Am Compl. [29].) The Amended Complaint included detailed allegations relating to Fidelity's appointment as trustee over the Harris Account. (*Id.* ¶¶ 51-75.) In addition to the fraudulent transfer claim, the new complaint alleged several additional claims: breach of contract, breach of fiduciary duty, fraud, fraudulent concealment, conversion, unjust enrichment, and violations of the Illinois Consumer Fraud Act and the Illinois Title Insurance Act. (Compl. ¶¶ 86-169.) Fidelity moved to dismiss the Amended Complaint, and the court granted that motion as to the contract, fiduciary duty, fraudulent concealment, conversion, and Title Insurance Act claims, but otherwise denied it.[16] *Indep. Trust Corp. v. Fid. Nat'l Title Ins.*, No. 05 C 5749, 2007 WL 1017858, at *28 (N.D. Ill. Mar. 30, 2007) (hereinafter "*InTrust*")

Fidelity has now moved for summary judgment on InTrust's common law fraud, Consumer Fraud Act, unjust enrichment, and fraudulent transfer claims. (Summ. J. Mem. [119] at 2.)

## DISCUSSION

Fidelity seeks summary judgment on five of InTrust's claims against it. Summary judgment is appropriate when the evidence, viewed in the light most favorable for the non-moving party, presents no genuine issue of material fact, so that the movant is entitled to judgment as a matter of law. *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir.2005). To defeat Fidelity's motion,

---

[16] InTrust has repleaded its fiduciary duty, fraudulent concealment, and Title Insurance Act claims, but Fidelity has not moved for summary judgment on those counts. InTrust has not renewed its contract or conversion claims.

InTrust must identify sufficient evidence to sustain each element of the case it must prove at trial. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 787 (7th Cir.2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The court will construe the facts in the light most favorable to InTrust, and draw all reasonable inferences in its favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir.2004).

Fidelity argues that InTrust has failed to amass sufficient evidence to prove its fraud claim, its Illinois Consumer Fraud Act claim, two of its Illinois Uniform Fraudulent Transfer Act claims, and its unjust enrichment claim. (Summ. J. Mem. at 2.) In addition to their briefs on this motion, both sides have filed lengthy motions seeking to strike portions of the other party's Local Rule 56.1 filings. (Pl.'s Mot. to Strike LR 56.1 Stmts. [134]; Def.'s Mot. to Strike LR 56.1 Submissions [152].) Fidelity has also moved to strike an affidavit by InTrust's expert. (Mot. to Strike Hosfield Aff. [149].) The court will first address the merits of the claims, and then the motions to strike.

## I.      Common Law Fraud Claim

Count III of the Second Amended Complaint alleges that Fidelity made knowingly false and misleading statements to the DFI and failed to make certain disclosures to the DFI that were necessary to avoid creating a false impression, that Fidelity made these misrepresentations and omissions with the intent to deceive and defraud InTrust, and that InTrust was harmed as a result. (2d Am. Compl. [66] ¶¶ 97-101.) Fidelity has moved for summary judgment, arguing that it made no false or misleading statements, that it believed all of its statements to the DFI were truthful, that any statements it did make did not proximately cause any harm to InTrust, and that InTrust did not rely on any statements made by Fidelity to the DFI. (Summ. J. Mem. at 11-14.) As explained below, the court concludes that InTrust has not provided evidence of either reliance or falsity, and Fidelity is therefore entitled to summary judgment on this claim.

Under Illinois law, a plaintiff claiming fraud must prove that the defendant made a false statement of material fact, that the defendant knew its statement was false and spoke with the

intention of inducing the plaintiff to act, and that "the plaintiff acted in justifiable reliance upon the statement." *Mitchell v. Norman James Constr. Co.*, 291 Ill. App. 3d 927, 940, 684 N.E.2d 872, 882 (1st Dist. 1997). InTrust admits that it did not learn of any of Fidelity's statements to the DFI until 2004 or 2005–long after Fidelity had become trustee over the Harris Account and disbursed the assets within. (LR 56.1 Resp. ¶ 91.) Thus, it is unsurprising that InTrust does not contend that it took any actions in reliance on Fidelity's statements; one could not act in reliance upon communications not received.

InTrust argues that it can nevertheless prevail upon its fraud claim because the harm resulting from a fraud need not be a direct result of the fraudulent conduct. InTrust relies on the principle that "while some connection, direct or indirect, between a party charged with making false representations and a party relying thereon must be shown, it is not essential . . . that the false representations be shown to have been made directly to the party claiming to have relied upon them." (Summ. J. Resp. at 29-30 (quoting *St. Joseph Hosp. v. Corbetta Constr. Co.*, 21 Ill App. 3d 925, 955, 316 N.E.2d 51, 72 (1st Dist. 1974).) In the circumstances here, however, not only were the alleged falsehoods not made directly to InTrust, but InTrust did not rely on them, either directly or indirectly. Relief is only available to a party "claiming to have relied upon" a fraudulent statement; to give rise to a fraud claim, a misrepresentation must "reach [the plaintiff, who] must rely on upon it, to his damage." 21 Ill. App. 3d at 954-55, 316 N.E.2d at 72 (citation and quotation marks omitted).

InTrust argues that it relied passively on the assumption that Fidelity was honest with the DFI, and that it demonstrated its reliance by not advocating to the DFI against Fidelity's assumption of duties as the Harris Account Trustee. (Summ J. Resp. at 30.) InTrust fails to cite any authority in support of its "passive reliance" argument, but there is some Illinois authority suggesting that passive reliance might be enough to support a fraud claim. *See, e.g.*, *Chatham Surgicore, Ltd. v. Health Care Serv. Corp.*, 356 Ill. App. 3d 795, 804, 826 N.E.2d 970, 977 (1st Dist. 2005) (a claim

for fraudulent misrepresentation requires allegations that the plaintiff relied upon the representation, and that the representation was "made for the purpose of inducing the plaintiff to act or refrain from acting"). Even assuming, however, that Illinois courts would allow recovery by a plaintiff who, in reliance upon a misrepresentation, refrained from acting, there is no authority to support InTrust's theory that a plaintiff could rely on a misrepresentation that it never knew about. Rather, Illinois courts require that "the misrepresentations must *reach* the plaintiff and he must in fact reasonably rely on them." *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 390, 618 N.E.2d 459, 466 (1st Dist. 1993) (emphasis added). By its own admissions, InTrust's failure to advocate against Fidelity's trusteeship cannot have been based upon its having been misled by Fidelity's communications to the DFI. Accordingly, its fraud claim cannot survive summary judgment.[17]

Apart from InTrust's failure to establish reliance, its fraud claim would fail, because InTrust has failed to produce evidence that Fidelity made false statements of material fact to the DFI. As the court has previously explained, InTrust cannot sustain a fraud claim[18] premised on omissions; it must demonstrate affirmative misrepresentations. *InTrust*, 2007 WL 1017858, at *23; *see Mitchell*, 291 Ill. App. 3d at 940, 684 N.E.2d at 882. Therefore, it is irrelevant for InTrust to argue about what the DFI "would like to have known" (Summ. J. Resp. at 27); the inquiry for the purposes of a fraud claim is not what Fidelity should have told the DFI, but rather, whether Fidelity told the DFI anything that was false.

InTrust argues that Fidelity made a misrepresentation when it told the DFI that Fidelity "would satisfy all escrow claims in full and that it wanted control of all funds remaining in the

---

[17]     Even if InTrust could establish passive reliance, it still would not be able to show that its injuries were caused by Fidelity's alleged misrepresentations. *See* Discussion, Part II, below. Proof that reliance caused damage is a necessary component of a common law fraud claim. *St. Joseph Hospital*, 21 Ill. App. 3d at 954-55, 316 N.E.2d at 72

[18]     This ruling applies only to the Count III fraud claim, not to InTrust's Count IV fraudulent concealment claim, which is not at issue in this motion for summary judgment.

Intercounty escrow account without mentioning the InTrust deposits." (Summ. J. Resp. at 27; *see, e.g.* Agreement at 3596, Ex. 62 to LR 56.1; Letter from Thomas to Byrne at 1., Ex. 29 to LR 56.1 Add'l. at 042939.)  This argument suffers from several flaws.  First, as discussed below at Part III, it is not clear that InTrust had any right to receive a portion of the Harris Account distribution, given that it could not trace its deposits into that account after January 2000.  Thus, if InTrust is arguing that Fidelity implicitly misrepresented the nature of the expected claims to the Harris Account, InTrust has not proven that the implied representation was false.  Nor has InTrust made any showing that Fidelity was speaking falsely when it claimed to "want[] control" of the Harris Account. Second, the alleged misrepresentation does not constitute a statement of material fact, and so it cannot support a fraud claim.  "The general rule denies recovery for fraud based upon a false representation of intention or future conduct. . . . Even a false promise of future conduct with no current intent to fulfill that promise will not constitute fraud." *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 387, 618 N.E.2d 459, 463 (1st Dist. 1993).

InTrust makes a number of contentions in its Local Rule 56.1 filings that various statements by Fidelity were false.  Few, if any, of these contended misrepresentations find support in the record, but the court need not dwell on the issue, because InTrust has omitted any argument in its briefing that these misrepresentations constituted fraud, and so has waived any claims based on these statements. *See Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) (noting that it is not the duty of the courts to construct parties' legal arguments for them, and that conclusory arguments are waived).  Given that InTrust has failed to produce evidence showing that Fidelity made any misrepresentations of material fact to the DFI, and that it has failed to offer evidence showing that it acted in reliance on Fidelity's communications with the DFI, InTrust's fraud claim must fail.[19]

---

[19]     The court declines to address the other arguments made by Fidelity in support of its
(continued...)

## II.    Illinois Consumer Fraud Act Claim

Count V of the Second Amended Complaint alleges that, in its course of dealings relating to the Harris Account, Fidelity engaged in an "unfair and/or deceptive business practice and consumer fraud in violation of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/2." (2d Am. Compl. ¶ 114.) The Consumer Fraud Act prohibits

> [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether [or not] any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2. In order to maintain a private right of action under the Consumer Fraud Act, a plaintiff must show that it has suffered "actual damage as a result of a violation of this Act." 815 ILCS 505/10a. Moreover, no private plaintiff can recover for a defendant's misrepresentations under the Act unless it can show that the deception proximately caused its harm. *Avery v. State Farm Mut. Auto. Ins.*, 216 Ill. 2d 100, 200, 835 N.E.2d 801, 862 (2005).

Fidelity argues that the Consumer Fraud Act claim cannot succeed because InTrust has insufficient evidence that any false statements or misleading omissions occurred, that Fidelity believed anything it said was false, that any consumers heard the allegedly false statements by Fidelity, or that Fidelity's communications with the DFI were the proximate cause of any harm to InTrust. (Summ. J. Mem. at 11-14.) Fidelity also argues that the claim is time-barred. (*Id.* at 25.) Again, the court concludes that Fidelity is entitled to summary judgment, both because the claim is deficient, and because it is untimely.

First, InTrust has failed to show that the allegedly false statements by Fidelity were the

---

[19](...continued)

motion for summary judgment on this count. Thus, the court need not determine whether InTrust produced sufficient evidence to show that Fidelity believed any of its statements were false, or whether the fraud claim is untimely.

proximate cause of its harm. Under Illinois law, the proximate-cause element of a Consumer Fraud Act claim premised upon misrepresentation requires proof that the plaintiff "was, in some manner, deceived" by the falsehood. *Avery*, 216 Ill. 2d at 200, 835 N.E.2d at 862 (quotation marks and citation omitted). A plaintiff who is not aware of a misrepresentation cannot recover. *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 76, 879 N.E.2d 910, 927 (2007) (holding that "plaintiffs must prove that each and every consumer who seeks redress actually saw and was deceived by the statements in question"). InTrust has admitted that it did not learn of Fidelity's statements to the DFI until years after any harm was caused to it. (LR 56.1 Resp. ¶ 91.) Nor has it distinguished the cases setting forth the Consumer Fraud Act's proximate cause rule; rather, it fails entirely to discuss them, while asserting conclusorily that "there is no requirement in a fraud action that the Receiver hear the fraudulent statements." (*See* Summ. J. Resp. at 29-31.) Thus, to the extent that InTrust's Consumer Fraud Act claim is based upon Fidelity's affirmative misrepresentations, it must fail, because InTrust cannot possibly establish that its harm was proximately caused by any misrepresentations made by Fidelity to the DFI.

InTrust's Consumer Fraud Act claim is also partially premised upon Fidelity's alleged failure to disclose information regarding the $9.2 million InTrust deposit to the DFI, and not merely upon its affirmative representations.[20] InTrust has waived any such "silent reliance" argument by failing

---

[20]     Although InTrust did not address any authorities discussing the Act's proximate-cause rule, there are Illinois cases suggesting that plaintiff can show proximate cause in an action premised upon deceptive omissions by offering proof that it "relied on the defendant's concealment by silence." *Galvan v. Nw. Mem'l Hosp.*, __ Ill. App. 3d __, 888 N.E.2d 529, 540 (1st Dist. 2008); *see Pappas v. Pella Corp.*, 363 Ill. App. 3d 795, 805, 844 N.E.2d 995, 1004 (1st Dist. 2006). Both of these cases are distinguishable, however, as both involved situations where the defendant had also made affirmative disclosures. *Pappas* involved a suit by the purchasers of windows against the seller of those windows; the buyer-seller relationship ordinarily involves either an implied warranty of merchantability, or express representations made in a sales contract. 363 Ill App. 3d at 805, 844 N.E.2d at 1004; 810 ILCS 5/2-314 (an implied warranty of merchantability attaches to all sales of goods unless excluded). Likewise, *Galvan* involved a suit against a hospital for failure to disclose pricing information, and included allegations that the hospital had failed to include those disclosures in promotional materials. 888 N.E.2d at 540. Neither case involved a defendant who
(continued...)

24

to cite to relevant authority. *Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005).

Even if this court were to overlook the waiver, however, it would be forced to conclude that InTrust has failed to produce sufficient evidence that it relied to its detriment on Fidelity's failure to tell the DFI about the $9.2 million transfer. Although InTrust contends that the DFI would not have made Fidelity trustee of the Harris Account if it had known of the InTrust deposit, it cites no evidence that would support that contention. (LR 56.1 Add'l ¶ 26, citing Vega Dep. at 248:23-249:9.) In fact, DFI Supervisor Henry Stirmell, who swears to a number of non-disclosures by Fidelity, makes no claim in his affidavit that those disclosures would have caused the DFI to reach a different result. Likewise, although InTrust argues in its brief that it did not "oppose the DFI orders" or "pursue a constructive trust action" action in reliance on Fidelity's silence, the citation provided says nothing about any such possibility. (Summ. J. Resp. at 30, citing LR 56.1 Add'l ¶ 30.) In reviewing the summary judgment exhibits, the court found no testimony by any InTrust or Receiver employee that he or she would have lobbied the DFI or sued Fidelity, had he known what Fidelity was, and was not, saying to the DFI in the summer of 2000. Thus, InTrust has failed to establish that its claimed harm—its failure to receive a share of the Harris Account disbursement—was proximately caused by any misrepresentations or omissions by Fidelity.

Finally, if InTrust's Consumer Fraud Act claim had merit, it would be untimely. The court

---

[20](...continued)
had never attempted to speak to the injured consumers at all, and who lacked any contractual relationship with them. Some Illinois Supreme Court cases suggest that proximate cause could not be established in such circumstances. *See Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 72-77, 879 N.E.2d 910, 925-28 (2007) (class certification was improper as to a class of all purchasers of a computer processor, in a case involving allegations of misleading omissions of negative performance data, because the only representation made to each class member in common was the name of the product itself); *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 139-40, 154-55, 776 N.E.2d 151, 155-56, 163-64 (2002) (plaintiff alleging misleading advertisements and omissions of material fact could not show proximate cause, even if he paid higher prices because of the deception, unless he could show that he had been "deceived" by the defendant's advertisements). The court need not pursue this matter further, however, given that InTrust has not demonstrated proximate cause even under the more lenient standard.

25

has previously ruled that this claim is subject to a three-year statute of limitations, which began running when InTrust knew, or reasonably should have known, that it was injured and that the cause of its injury was wrongful. *InTrust*, 2007 WL 1017858, at *15 & n.13 (citing 815 ILCS 505/10a(e) and *Santa Claus Indus. v. First Nat'l Bank of Chicago*, 216 Ill. App. 3d 231, 236, 576 N.E.2d 326, 329-30 (1st Dist. 1991)). The tolling agreement does not come into play unless InTrust was on notice of its claims less than three years before April 4, 2004. Thus, the threshold inquiry is whether InTrust knew, or should have known, that it had been wronged prior to April 4, 2001.

Even when the facts are viewed in the light most favorable to InTrust, it is impossible to conclude that InTrust was not on notice of its injury significantly earlier than April 2001. In is undisputed that:

- InTrust knew by May 2000 that its $9.2 million had been deposited into the Second LaSalle Account. (LR 56.1 ¶ 105.)

- InTrust knew, no later than October 17, 2000, that the balance in the Second LaSalle Account had been moved into the Harris Account. (LR 56.1 ¶ 116.)

- InTrust knew, after reviewing Fidelity's complaint against INTIC, that Fidelity had control over the Harris Account. (LR 56.1 Resp. ¶ 119.) InTrust received this complaint on September 18, 2000. (LR 56.1 ¶ 118.)

- InTrust's counsel created an "outline of claims against Fidelity" before October 24, 2000, which included possible claims relating to Fidelity's control over the escrow funds. (LR 56.1 Resp. ¶ 125.)

- Before the end of 2000, InTrust had obtained the Harris Account statements from Harris Bank. (LR 56.1 Add'l ¶ 57.)

These undisputed facts clearly show that InTrust had reason to know, prior to 2001, that its money might have been moved to the Harris Account, and that Fidelity had taken control over that account. Furthermore, InTrust already knew quite well that some of InTrust's money had vanished from New Intercounty's accounts, because Hargrove had told it so in February 2000. (LR 56.1 ¶ 97.) Thus, InTrust knew of its claimed injury—that Fidelity had seized control over an account in which InTrust believed its money had ended up—prior to 2001. Moreover, given InTrust's position that it was

entitled to a *pro rata* distribution of the money in the Harris Account, it was surely on notice that it was not receiving such a distribution from Fidelity at that time. Finally, given that InTrust's counsel was specifically contemplating suing Fidelity over its rights to New Intercounty's escrow account as early as October 2000, it is simply impossible for InTrust to plausibly maintain that it did not have reason to know, by December 2001, that Fidelity's assumption of control over the Harris Account might be wrongful.

InTrust implicitly concedes this point; it does not argue that the statute of limitations did not begin to run until April 2001, but only that the statute of limitations was tolled because Fidelity fraudulently concealed InTrust's right to sue. (Summ. J. Resp. at 35.) InTrust cites only *In re Copper Antitrust Litig.*, 436 F.3d 782 (7th Cir. 2006) in support of this argument; this court has already instructed the parties, however, that it is Illinois law, not federal law, that controls the question of tolling by fraudulent concealment.[21] *InTrust*, 2007 WL 1017858, at *16.

Illinois law only supports tolling for fraudulent concealment when the defendant (1) makes knowingly false representations, (2) with the intent to deceive the plaintiff, (3) on which the plaintiff detrimentally relied by delaying the filing of a claim (4) that the plaintiff could not have identified through the exercise of ordinary diligence. *Foster v. Plaut*, 252 Ill. App. 3d 692, 699, 625 N.E.2d 198, 203-04 (1st Dist. 1993). The only "misrepresentation" identified by InTrust consists of a claim of privilege that InTrust disputes, and "false promises" connected to delays in responding to discovery requests. Even taken in the light most favorable to InTrust, such conduct falls far short of fraudulent concealment. Broken promises, which relate to future conduct and not present facts,

---

[21]     Nor is it clear that *Copper Antitrust* supports equitable tolling in this circumstance. That case makes it clear that a plaintiff may not take advantage of tolling due to fraudulent concealment or equitable estoppel absent a showing that it could not have known of the offense through the exercise of due diligence. 436 F.3d at 791. InTrust has not proffered evidence demonstrating that it could not have learned what Fidelity said to the DFI from another party, however. Moreover, the *Copper Antitrust* court noted that "denying liability or failure to cooperate is not enough to invoke the doctrine of fraudulent concealment." *Id.* at 792.

generally are not considered fraudulent under Illinois law.  *See Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 901 (7th Cir. 2006).  Nor has InTrust made more than conclusory statements in support of the assertion that Fidelity's claim of privilege was "false."  (LR 56.1 Add'l ¶ 51.)

InTrust also argues that the limitations period was paused by the doctrine of equitable tolling, which applies in Illinois when the defendant has "actively misled the plaintiff, or . . . prevented [it] from asserting [its] rights in some extraordinary way, or if the plaintiff has mistakenly asserted [its] rights in the wrong forum."  *Clay v. Kuhl*, 189 Ill. 2d 603, 614, 727 N.E.2d 217, 223 (2000).  None of these situations are presented by InTrust's contentions that Fidelity made an arguably improper claim of privilege or stalled its responses to discovery. Because InTrust has not amassed sufficient evidence to prove the proximate causation element of its Consumer Fraud Act claim, and because that claim is untimely, Fidelity is entitled to summary judgment.[22]

## III.    Fraudulent Transfer Claims

The Second Amended Complaint contains three claims that Fidelity violated the Illinois Uniform Fraudulent Transfer Act, only two of which are attacked in Fidelity's summary judgment motion.  The two counts at issue here both allege that Fidelity gave inadequate consideration to Hargrove for the transfer of his assets in the three Hargrove Agreements.  Count IX alleges that Fidelity violated 740 ILCS 160/6, which provides that a transfer made by a debtor "without receiving reasonably equivalent value" "is fraudulent as to a creditor whose claim arose before the transfer." (2d Am. Compl. ¶¶ 137-143.)  Count X alleges that Fidelity violated 740 ILCS 160/5(a)(2), which provides, *inter alia*, that a transfer is fraudulent, as to any creditor, when it was not made for reasonably equivalent value and where the debtor "was engaged in a business . . . for which the

_____

[22]    Once again, given that this claim cannot succeed, the court need not address Fidelity's argument that InTrust failed to prove that Fidelity had the *mens rea* necessary to support a Consumer Fraud Claim.  The court notes, however, that its previous conclusion that InTrust has failed to prove that any of Fidelity's statements were false, applies with equal force here, to the degree that Count V is premised upon arguments that Fidelity made affirmative misrepresentations to the DFI.

remaining assets of the debtor were unreasonably small . . . ." (2d Am. Compl. ¶¶ 144-150.) Fidelity argues that both claims fail because it did give Hargrove reasonably equivalent value for the asset transfers. The court agrees that InTrust has not presented evidence sufficient to support a finding that Fidelity did not give adequate consideration for the Hargrove Asset transfers.

Fidelity notes that, in exchange for Hargove's collateral in the three Hargrove Agreements, Fidelity both provided funds to New Intercounty to cover escrow account deficiencies, and provided Hargrove with a release of all liability relating to the escrow shortfall, to the extent of the collateral provided plus the amount of the $2 million deposit Hargrove made to reduce the shortfall. (Summ. J. Mem. at 16.) A transfer is not made for "reasonably equivalent value" when the transferee gives no consideration, or too little consideration, for the assets received. *Regan v. Ivanelli*, 246 Ill. App. 3d 798, 804, 617 N.E.2d 808, 814 (2d Dist. 1993). Value is typically a question of fact, and it is measured at the time of the transfer, not in retrospect. *Wachovia Secs., LLC v. Neuhauser*, 528 F. Supp. 2d 834, 859-60 (N.D. Ill. 2007). The question, then, is whether InTrust has evidence showing that the release and the funding of the escrow were worth significantly less than the assets pledged to Fidelity, at the time of the Spring 2000 transfers.[23] It is undisputed that the value of those assets was more than $8.5 million. (LR 56.1 ¶ 53.)

Fidelity argues that its release was necessarily equal in value to the collateral provided, because Hargrove was released to the exact extent of the collateral's realized value. (Summ. J. Mem. at 16.) The problem with this argument is that the value is only precisely equal if Fidelity were

---

[23] Frequently, analysis of the reasonably equivalent value issue proceeds according to a four-factor test developed in Bankruptcy Code cases. *Wachovia*, 528 F. Supp. 2d at 860. That test looks to (1) whether the value of what is given is equal to what is received; (2) the market value of what is given and what is received; (3) whether the transferor and the transferee engaged in an arm's length transaction; and (4) whether the transferee acted in good faith. *Id.* The parties have not organized their briefing in this manner, however, but have instead focused entirely on the first factor. Given the lack of discussion of (2), (3), and (4) by the parties, the court, too, will confine its discussion to the evidence submitted regarding the actual value of the assets given to Hargrove by Fidelity.

certain to prevail on its claims against Hargrove up to the amount of the collateral secured. A judge or jury could have determined that Fidelity was entitled to less than the amount of the collateral in a subsequent suit against Hargrove, or determined that Hargrove had no liability. It would cost Fidelity nothing, after all, to release a claim with virtually no probability of success. Thus, the value of the release must be discounted to reflect Fidelity's likely probability, in the Spring of 2000, of obtaining a future judgment against Hargrove in excess of $8 million. Peter Toll Hoffman, *Valuation of Cases for Settlement: Theory and Practice*, 1991 J. Dispute Resol. 1, at 9-10 (1991) (suggesting that the expected value of a lawsuit is best derived by estimating the odds of a successful verdict and its likely amount—based on an analysis of verdicts in similar cases—less expected litigation costs).

Fidelity cites several cases that it argues require a different result; according to Fidelity, these cases show that a release of corresponding legal obligations in exchange for a transfer of assets always constitutes reasonably equivalent value. The cases cited by Fidelity, however, all involve situations in which the released claim has both a clear dollar amount and a high probability of success. *See Scholes v. Lehman*, 56 F.3d 750, 758 (7th Cir. 1995) (stating that release of a *valid* claim of *equal* value to the released collateral constitutes adequate consideration); *In re AFI Holding, Inc.*, 525 F.3d 700, 708 (9th Cir. 2008) (finding reasonably equivalent value where defendant had received a release in exchange for a valid restitution claim); *First Commercial Mgmt. Group*, 279 B.R. at 239 (finding reasonably equivalent value when defendant was paid already-owed commissions in exchange for a release of those commissions, and noting that absent the release, the defendant would have had a valid claim for the same sum). Thus, if the claims against Hargrove were dubious, the fact that the release was for an equal sum as the value of the collateral would not shield Fidelity.

Although InTrust points to the fact that Fidelity's outside counsel, Edwin Thomas, "questioned whether Hargrove was providing Hargrove with enough consideration to even make

the agreements enforceable" (Summ. J. Resp. 22), his deposition testimony reflects that this concern was voiced before the finalized agreements were drafted, and that he modified the agreements to address this concern. (Thomas Testimony at 1559-60.) Likewise, InTrust argues that the releases were worthless because Fidelity has not obtained an enforceable judgment against Hargrove. As discussed in the background section, Fidelity did obtain a verdict against Hargrove, and the Seventh Circuit's reversal of verdicts in favor of other defendants might indicate the verdict was too low, not too high. Even if it is not, Hargrove has since been imprisoned and has declined to defend himself in the subsequent civil proceedings, leading Fidelity to seek a default judgment against him earlier this month. Thus, it is far from clear that Fidelity's failure to obtain a verdict to date is indicative of any weakness in its claim; and that failure says even less about the expected value of the claim against Hargrove as of 2000.

Nor is there any validity to InTrust's argument that a release cannot be reasonably equivalent value unless the defendant obtains a judgment against the debtor for a sum equal to or beyond the full value of the release. (Summ. J. Resp. ¶ 23.) This claim finds no support in the authority cited by InTrust. *See In re General Search.com*, 322 B.R. 836, 846 (N.D. Ill. 2005) (holding that a "Settlement Agreement" that contained no language releasing any claims, did not in fact release any claims, and hence provided no value to the debtor). Nor does the proposition accord with common sense. A defendant might very well decide not to sue a debtor whom it had previously furnished with a release; this debtor would have realized value from his release, even though the release was never used as a defense to litigation. Moreover, such a rule would violate the bedrock principle that whether value is reasonably equivalent must be assessed at the time of the transfer, and not in hindsight.[24] *Wachovia*, 528 F. Supp. 2d at 860.

_____

[24] InTrust's also argues that Fidelity's opposition to Hargrove's assertion of the release as a defense vitiates any claim that it represented value to Hargrove, because it makes the release a mere "unperformed promise." (Summ. J. Resp. at 24.) This argument has a similar flaw as the
(continued...)

InTrust also argues that the low jury verdict on Fidelity's claim against Hargrove—it awarded Fidelity only $1.5 million—shows that the release was worth less than the collateral. This argument suffers from a factual flaw: the jury was instructed that, if it found that the release was valid, it could reduce the damages accordingly. There is no way to know whether the jury found the release valid or not; InTrust's argument, therefore, rests on pure speculation.

InTrust observes that the Hargrove III Agreement does not contain any language granting a release. (Hargrove III Agreement at 1-2.) Fidelity maintains that that Agreement, which is labeled as a "Supplement" to the earlier agreements, incorporated the release provisions of the earlier agreements by reference. It is possible that this is the case; Illinois law does allow multiple agreements executed by the same parties in the course of one transaction to be construed as a whole. *Tepfer v. Deerfield Sav. & Loan Ass'n*, 118 Ill. App. 3d 77, 80, 454 N.E.2d 676, 679 (1st Dist. 1983). The "Supplement," however, was executed on a different date than the earlier agreements, and discusses different collateral transfers, making it impossible to determine, from its plain language alone, whether the parties intended to incorporate by reference the parallel release provisions of the prior agreements. The earlier agreement, moreover, contains no indication that the parties intended the release provision to expand to cover future assignments of collateral as well. Rather, the Hargrove II Agreement provides that "Fidelity will [release Hargrove] to the extent of the collateral described in paragraph 2 above . . . " and the Hargrove I Agreement contained a parallel provision. (Hargrove II Agreement ¶ 7; Hargrove I Agreement ¶ 6 ("Fidelity will release Hargrove . . . [but] this release will be limited to the value of the collateral hereinabove described . . . .").) This language is logically incompatible with the reading urged by Fidelity, which

---

[24](...continued)
argument discussed above: it makes the value of a release at the time of transfer depend on the releasee's subsequent behavior. It also misunderstands the nature of a release, which is not a mere "promise," but rather a binding legal obligation. A valid release does not cease to be effective merely because the releasor contests it.

would require these provisions to be read to apply as well to the collateral described in the Hargrove III Agreement. The court concludes the third agreement did not incorporate a release.

Therefore, Fidelity did not give "reasonably equivalent value" for the collateral described in the Hargrove III Agreement by furnishing a release, because no release was furnished. It does not follow, however, that it did not furnish fair value for the collateral described in the first two agreements. Furthermore, even the absence of a release given in exchange for the additional collateral described in the third agreement might not make that transfer fraudulent, given that Fidelity also claims to have given value for the asset transfers by funding the escrow deficiencies.

InTrust argues that funding the escrow cannot be considered reasonably equivalent value, because Fidelity was already obligated to cover the deficiencies under its reinsurance agreement. (Summ. J. Resp. ¶ 24.) This argument is defeated by the plain language of the UFTA, which provides that "value is given . . . if . . . an antecedent debt is secured or satisfied." 740 ILCS 160/4. Fidelity, therefore, could give value by funding the escrow, even if funding it satisfied a preexisting legal obligation. Similarly, InTrust is incorrect when it argues that funding the escrow could not possibly be value to Hargrove, because the money went to New Intercounty's and INTIC's creditors. Funding the escrow shortfall may have reduced Hargrove's personal liability to creditors. If this occurred, then Hargrove may have received value from Fidelity's decision to fund the shortfall. *See In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 354 (C.D. Ill. 2006) (noting that indirect benefits to the debtor can be value for IUFTA purposes). Notably, InTrust has not considered what value Hargrove might have gained as a third-party beneficiary to Fidelity's undertaking to fund the escrow shortfall. Nor has it provided any serious basis for its contentions that the claims arising from Hargrove's wrongdoing—the claims released by Fidelity in the first two asset transfer agreements—were unlikely to succeed.

InTrust did obtain an expert opinion regarding reasonably equivalent value. (Hosfield Report at 13-15.) It chose not to cite this opinion in its briefing, however. (Summ. J. Resp. at 21-26.) By

failing to cite or argue this evidence, InTrust has waived any arguments depending on Hosfield's valuation of the release. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) (explaining that the courts "will not scour the record to locate evidence supporting a party's legal argument," and that "perfunctory or undeveloped arguments are waived"). Nor would relying on the Hosfield Report have availed InTrust. The only basis given for his conclusion that the release was of no value to Hargrove was that "[Fidelity's] claim would have to be reduced by the value of the collateral . . . regardless of this agreement." (Hosfield Rep. at 14.) Even if Hargrove could have asserted payment as a partial defense to a claim by Fidelity, however, the law is clear that furnishing a release for a claim owed constitutes value. *In re First Commercial Mgmt. Group*, 279 B.R. 230, 239 (N.D. Ill. 2002). This is true even if the claim would be extinguished by payment alone. *See id.* (finding that reasonably equivalent value was given when a debtor exchanged payment of a commission owed for a release of a claim for non-payment of that commission).[25] Hosfield's conclusions regarding the value of the asset transfers and the funding of the escrow are based on "unsupported assumptions and theoretical speculation," and are "no bar to summary judgment." *Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997). Moreover, given that his opinion rests on his views regarding the law of fraudulent transfer, a matter on which he is not an expert, his opinion on this subject would not be admissible at trial. Fed. R. Evid. 702.

Once Fidelity moved for summary judgment and argued that it provided reasonably equivalent value for the asset transfers, it was up to InTrust to produce evidence showing that this was not the case. Fed. R. Civ. P. 56(e) (opposing party who bears the burden of proof must set out specific facts showing a genuine issue for trial); *Wachovia*, 528 F. Supp. 2d at 859 (plaintiff must

---

[25] The only other bases for Hosfield's opinion that reasonably equivalent value was not given are other assertions regarding the law: that Fidelity gave no value in funding the escrow shortfall because it was already obligated to do so under its reinsurance agreement, and that renewing the reinsurance agreement was valueless because Fidelity subsequently breached its contract. Both of these arguments have been discussed (and rejected) above.

prove all the elements of a "fraud in law" claim, including that transfers were not for reasonably equivalent value). Nor can InTrust escape summary judgment by arguing that "whether reasonably equivalent value has been given is a question of fact for the jury." (Summ. J. Resp. at 25.) It is true that whether fair value has been given is considered a question of fact and not law, and is, therefore, the type of question that is normally resolved by juries and not judges. *See In re H. King & Assocs.*, 295 B.R. 246, 289 (N.D. Ill. 2003). It does not follow, however, that a plaintiff who has not shown that there is a dispute of material fact concerning the amount of value provided to a debtor, nevertheless may survive summary judgment. Because InTrust has not gone beyond pure speculation in its attempt to show that the value provided by Fidelity was not reasonably equivalent to the value of the Hargrove collateral, Fidelity is entitled to summary judgment on the fraudulent transfer claims.[26]

## IV.    Unjust Enrichment Claim

In Count XI of the Second Amended Complaint, InTrust claims that Fidelity was unjustly enriched by Hargrove's asset transfers and by gaining control of the Harris Account, because these transfers reduced its liability on its reinsurance obligations at InTrust's expense. (2d Am. Compl. ¶¶ 151-62.) An unjust enrichment claim requires proof that the defendant has "unjustly retained a benefit to the plaintiff's detriment," and that the retention "violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989). When someone other than the plaintiff transfers the benefit to the defendant, however, courts require an additional showing. *Id.* at 161-62, 545 N.E.2d at 679. A plaintiff alleging third-party unjust enrichment must demonstrate one of three things[27]: (1)

---

[26]    The court therefore declines to consider whether or not the fraudulent transfers claims were timely.

[27]    InTrust argues that these criteria are not exclusive, citing *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 738 n.3 (7th Cir. 1990). In *Midcoast*, the Seventh Circuit (continued...)

that the benefit should have gone to the plaintiff, but that the third party gave it to the defendant by mistake; (2) that the defendant obtained the benefit through wrongful conduct; or (3) that the plaintiff has a better claim to the benefit than the defendant. *Id.* Fidelity has moved for summary judgment, arguing that InTrust has not produced evidence to prove that the benefit was obtained wrongfully or via mistake, and that InTrust does not have a better claim to the benefit than Fidelity. (Summ. J. Mem. at 14.)

**Did InTrust Have a Better Claim than Fidelity to the Relevant Assets?**

First, InTrust argues that it has a "better claim" to the escrow fund and to the Hargrove assets that were transferred to Fidelity. This claim has several components. First, InTrust argues that Fidelity was enriched when Hargrove stole InTrust's money and used it to pay off real estate escrowees insured by Fidelity, via a $100 million dollar transfer from the First LaSalle Account to the Second LaSalle Account between 1995 and 1997. (Summ. J. Resp. at 17, citing LR 56.1 Resp. ¶ 26.) InTrust, however, has never included any such damages in its disclosures to Fidelity during discovery. (*See* InTrust's Rule 26(a)(1) Initial Disclosures at 3, Ex. B to Summ. J. Reply; InTrust's Am. Rule 26(a)(1) Initial Disclosures at 5, Ex. C to Summ. J. Reply; Email from Merrill to Perdew, 5/10/07, titled "Damage Disclosures", Ex. D to Summ. J. Reply; InTrust's Supp. Resp. to Fidelity's First Set of Interrogs. at 4-6, Ex. E to Summ. J. Reply.) Failing to include a damage claim among

---

[27](...continued)
observed that "*HPI* . . . does not state that only under the conditions mentioned is a defendant's retention of a benefit unjust," and noted that "[i]ts holding is hardly restrictive." *Id.* Illinois courts appear to have read *HPI*'s language more restrictively than this dictum predicted, however. *See State Farm Gen. Ins. Co. v. Stewart*, 288 Ill. App. 3d 678, 691, 681 N.E.2d 625, 633-34 (1st Dist. 1997) (holding that a plaintiff "must show" one of the three factors to prevail); *Wolff v. Ampacet Corp.*, 284 Ill. App. 3d 824, 831, 673 N.E.2d 745, 749-50 (1st Dist. 1996) (holding that the *HPI* court "limited the recovery of an unjust enrichment benefit derived from third parties to three situations", *overruled on other grounds by Morris B. Chapman & Assocs. v. Kitzman*, 193 Ill.2d 560, 575, 739 N.E.2d 1263, 1273 (2000). In any event, although InTrust argues that it can prevail because the court "may properly consider the equities of a particular situation without undue rigidity to determine if it constitutes unjust enrichment," InTrust has not made any specific arguments in favor of its unjust enrichment claim that are not addressed to one of the three tests enumerated in *HPI*. (Summ. J. Resp. at 18-20.)

initial or supplemented disclosures, or to disclose it in response to an interrogatory, mandates exclusion as a sanction, unless the party failing to make disclosures can show that its violation was justified or harmless. FED. R. CIV. P. 37(c)(1); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230-31 (7th Cir. 1996); *Advanced Cleanroom Techs. v. Newhouse*, No. 00 C 6623, 2002 WL 206960, at *4-5 (N.D. Ill. 2002) (enforcing this rule to preclude plaintiff from relying on evidence to defeat summary judgment motion). Although InTrust has filed a surreply, it did not use that opportunity to explain its failure to disclose, or to argue that it was harmless. (Summ. J. Surreply [182] at 1-6.) Accordingly, InTrust may not assert a new damages theory in its summary judgment response; and the court will not consider an unjust enrichment argument premised on pre-2000 LaSalle Account transfers.

InTrust next argues that it had a better claim than Fidelity to the assets in the Harris Account, which Fidelity used to pay real estate escrow claimants, thereby reducing its liability. (Summ. J. Resp. at 18.) To a large extent, this claim depends on whether InTrust had a right to partake in the distribution of the assets contained in the Harris Account. Fidelity argues that InTrust had no interest in the Harris Account, because all of its funds were placed into the account before that account ran a negative balance in January 2000, and therefore none of InTrust's funds could have been in the account when Fidelity took it over.

In order to impose a constructive trust on a specific fund, a plaintiff must show that its funds can be traced into that fund. *In re Comm'r of Banks & Real Estate*, 327 Ill. App. 3d 441, 480-81, 764 N.E.2d 66, 100-01 (1st Dist. 2001). If multiple claimants' funds are commingled in a single fund, a claimant is generally entitled to a *pro rata* share in proportion to his contribution. *Id.* However, if the *res* of a trust disappears, the trust ceases, and the obligation to pay becomes merely a personal debt. *See In re Stotler & Co.*, 144 B.R. 385, 391 (N.D. Ill. 1992). As one authority has put it:

The generally adopted view denies the remedy of tracing . . . where the evidence

shows that the trust property has been disposed of in such a way as to leave no product. Thus if the testimony for the complainant shows that the trustee used trust credit to pay his living expenses, or the credit was lost in gambling, there is clearly no property right left in the trustee as a result of such payments and no subject matter to be taken by the tracing remedy.

George Gleason Bogert et al., *Bogert's Trusts & Trustees* § 921 (2007); *see id.* at n.14 (collecting cases). Accordingly, once an account is run into a negative balance, any constructive trust in the funds in that account, including any *pro rata* interest in a commingled account, ceases, leaving only a personal liability in the trustee, accompanied perhaps by a constructive trust following the withdrawn funds into their subsequent uses.

InTrust devotes a substantial portion of its summary judgment briefing to arguing that this rule does not bar its claim. InTrust cites *In re Strategic Technologies, Inc.*, 142 Fed. Appx. 562, 566-67 (3d Cir. 2005), for the proposition that *pro rata* distribution is appropriate even after a funding account had gone negative. *Strategic Technologies* (which was labeled "Not Precedential") did determine that beneficiaries who deposited money into an account that was subsequently zeroed out and refilled could claim a *pro rata* share of the subsequent balance, because "this Court has indicated a preference for pro rata distribution" and because failing to do so might harm "other customers similarly situated." *Id.* The court did not cite any authority supporting this departure from ordinary constructive trust principles; the only case cited, *Goldberg v. N.J. Lawyers' Fund for Client Prot.*, 932 F.2d 273, 280 (3d Cir. 1991), merely stated the black letter rule that "courts favor a *pro rata* distribution of funds when such funds are claimed by creditors of like status," without discussing whether creditors placing funds in an account before that account was exhausted stand on equal footing with creditors who can trace their funds to an identifiable existing balance.[28] The

_____

[28] InTrust cites another group of cases dealing with the powers of a court or an appointed receiver to equitably distribute seized assets; some such cases find it to be a permissible exercise of discretion to distribute funds evenly without reference to traceability. *See, e.g., SEC v. Forex Asset Mgmt.*, 242 F.3d 325, 331-32 (5th Cir. 2001) (appointed receiver did not abuse its discretion by disregarding traceability); *United States v. Durham*, 86 F.3d 70, 71-73 (5th Cir. 1996).

(continued...)

court declines to adopt the *Strategic Technologies* decision, which is deemed nonprecedential by the court that decided it.

InTrust points to a number of cases discussing Ponzi schemes. These cases sensibly reject the argument that where multiple depositors have placed assets into a commingled fund over time, from which a defendant has been stealing over time, the losses should necessarily accrue to the earlier depositors rather than the later. *See, e.g., Ruddle v. Moore*, 411 F.2d 718, 718 (D.C. Cir. 1969). It is one thing to say that, when a thief steals from a commingled pool of money, the losses should be shared equally among those who have placed money in the pool, regardless of when they placed their money in the pool. It is a different situation entirely, however, if a thief has stolen all of the money from a commingled group of accounts, and then stolen only some of the money from an identifiably different set of commingled accounts. *Pro rata* distribution applied to the latter case is little more than a judicially sanctioned form of redistribution, with the court taking extra money from the second group to compensate the first for its losses. This is the peculiar result that the general rule—which insists on tracing as a prerequisite to any constructive trust action—avoids.

Thus, the prevailing rule, which requires tracing as a prerequisite to a constructive trust, suggests that InTrust had no superior rights over Fidelity to the escrow funds once the Harris Account had been depleted and replenished. At most, InTrust has shown that a court of equity may have had the power, in its discretion, to order a *pro rata* distribution as between it and the newer creditors. But the fact that a court might have chosen this remedy does not mean that InTrust had a better claim than Fidelity (as a payor to the subsequent creditors) to the Harris Account. Accordingly, InTrust cannot establish that it had a better claim to the Harris Account than Fidelity

---

[28](...continued)
These cases do not establish the proposition that InTrust had a *better* claim to the escrow fund in the Spring of 2000 than Fidelity did. *Durham* noted, in fact, that distribution giving priority to those who could trace their deposits would have been equally permissible. 86 F.3d at 73

in 2000, based upon pre-2000 transfers of its funds into that account.[29]

InTrust argues that Hargrove placed his own assets into the escrow fund, and that Fidelity subsequently was enriched by these assets, and asserts that this also was a form of unjust enrichment. (Summ. J. Resp. ¶ 19.) It offers no argument, however, as to why InTrust had a greater right to this sum than did Fidelity. If InTrust had produced evidence that Hargrove deposited funds into the Harris Account that were traceable to his pre-2000 withdrawals from an account held in constructive trust for InTrust, than InTrust might well be able to establish that it had a better claim than Fidelity to a *pro rata* portion of that deposit. It has offered no such proof, however, so Hargrove's deposit cannot salvage its claim.

Finally, InTrust argues that it has a superior claim to the Hargrove Asset Transfers. Its argument on this point consists of a repetition of its claim that Fidelity did not provide reasonably equivalent value to Hargrove. (Summ. J. Resp. at 18.) As discussed above, InTrust has not produced sufficient evidence to sustain such a claim. Accordingly, it has not established that it had a superior right to any portion of either the Hargrove Asset Transfers or the Harris Account at the time Fidelity assumed control over those assets in 2000.

**Did Fidelity Obtain the Assets Through Wrongful Conduct?**

InTrust's second unjust enrichment theory is that Fidelity procured control over the collateral and the Harris Account by wrongful means. (Summ. J. Resp. at 20.) Wrongful conduct alone will

---

[29] InTrust also argues that it has demonstrated its superior claim to the Harris Account by offering the testimony of its accounting expert, who testified that a zero account balance does not extinguish liabilities, under appropriate principles of accounting theory. (Hosfield Aff. ¶ 17, Ex. 82 to LR 56.1 Add'l.) This does not contradict the analysis above, which distinguishes between the persisting personal liability of the trustee, and the termination of the constructive trust. Nor does it contradict the key conclusion of Fidelity's accounting expert, who opined that no InTrust money remained in the Harris Account after it was drawn into negative balances, and that none of the subsequent deposits came from InTrust. (Pollard Rep. at 24, Ex. 12 to LR 56.1.) In any event, the accounting principles Mr. Hosfield explains are not controlling of the legal issues involved here. Thus, the court does not agree with InTrust that a "battle of the experts" precludes summary judgment. (Summ. J. Resp. at 14.)

not support an unjust enrichment claim, however; the plaintiff must also have some interest in the property that a third party gave to the defendant. *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1234 (N.D. Ill. 2005) (collecting cases). As discussed above, InTrust has not demonstrated that either the funds in the escrow account or the Hargrove collateral belonged to it, in any meaningful sense. In the absence of such a showing, InTrust cannot establish its right to that property by means of the wrongful conduct test.

Moreover, the court is not satisfied that InTrust has established wrongful conduct on Fidelity's part. InTrust asserts that "Fidelity's wrongful conduct [consists of] its breach of fiduciary duty that is not even the subject of this . . . motion, its fraudulent concealment that is likewise not part of this motion, and its fraudulent misrepresentations to the DFI." (*Id.*) No evidence of any breach of fiduciary duty or fraudulent concealment is identified, and no further argument is made to support the claim that Fidelity committed such wrongs. Accordingly, InTrust has waived any argument that either breach of fiduciary duty or fraudulent concealment constituted Fidelity's wrongful conduct. *See Econ. Folding Box*, 515 F.3d at 721. Furthermore, as discussed above, InTrust has failed to produce evidence of any fraudulent misrepresentations by Fidelity to the DFI. Therefore, none of these examples of "wrongdoing" can support InTrust's unjust enrichment claim.

InTrust also argues that "even if . . . Fidelity [merely] failed to adequately investigate whether InTrust's money was in the account or failed to give InTrust an opportunity to argue its claim, it would support the relatively low threshold" required for showing wrongfulness. (Summ. J. Resp. at 20.) Even if the showing for wrongfulness is as modest as InTrust suggests[30], however, InTrust

---

[30] It is not clear that this is the case. InTrust argues that "wrongfulness" means merely that the defendant acts unjustly, citing *Midcoast Aviation*. (Summ. J. Resp. at 20-21.) *See* 907 F.2d at 738 n.3. As discussed previously, *Midcoast Aviation* concluded that the three tests for third party unjust enrichment were inclusive, rather than exclusive; Illinois courts may not agree. *See id.*; *State Farm*, 288 Ill. App. 3d at 691, 681 N.E.2d at 633-34; *Wolff*, 284 Ill. App. 3d at 831, 673 N.E.2d at 749-50. The permissive understanding of "wrongfulness" made sense in the context of *Midcoast Aviation*'s reading of the three tests as merely particularized methods of demonstrating
(continued...)

must still link this "wrongfulness" with its injury. It is not enough to show that the defendant, at some point in time, behaved "wrongfully"; rather, the plaintiff must show that the defendant "procured the benefit . . . through some type of wrongful conduct." *HPI,* 131 Ill. 2d at 161-62, 545 N.E.2d at 679. This language suggests that there must be a causal link between the wrongful conduct and the acquisition by the defendant of the benefit.[31] InTrust never contends, however, that if Fidelity had made a further investigation, or if InTrust had been given an opportunity to argue its claim, that it would have been able to share in any distribution. Accordingly, it cannot sustain its unjust enrichment claim by pointing to "wrongful conduct" by Fidelity.

**Were InTrust's Assets Given to Fidelity By Another's Mistake?**

Finally, InTrust argues that it has shown that its claim proceeds from "[b]enefits mistakenly given to Fidelity," but this argument is little more than a placeholder. (Summ. J. Resp. ¶ 21.) First, it suggests that New Intercounty may have believed that InTrust's money was not in the Harris Account. There is no evidence of this, however. InTrust proceeds by arguing that Fidelity may have been making the same mistake, but this cannot sustain an unjust enrichment claim, because relief under this theory is only available due to a third party's mistake, not due to the defendant's. *See HPI*, 131 Ill. 2d at 161-62, 545 N.E.2d at 679.

InTrust, therefore, has not produced evidence showing that Fidelity obtained control over the collateral or the Harris Account by wrongful conduct or another's mistake. Nor has it shown that

---

[30](...continued)
the requisite unjustness. if the tests are understood as mandatory, the court believes that "wrongfulness" must mean more than "unjustness."

[31]     The causation requirement is consistent even with the permissive standard of "wrongfulness" applied in *Midcoast Aviation.* In that case, the court found that a jury could reasonably conclude that a defendant acted wrongfully by enticing the plaintiff to perform improvements on a plane that it owned, under a contract with a third party, and then refusing to compensate the plaintiff when the third party defaulted. 907 F.2d at 739-40. In other words, the contended "wrongfulness"—enticing another person to do work and then refusing to pay them for it—was a clear cause of the resulting injury.

it has a better claim than Fidelity to these assets. Accordingly, its unjust enrichment claim cannot survive summary judgment.[32]

## V.  Motions to Strike

Both parties have moved to strike portions of the other party's Local Rule 56.1 filings. (Pl.'s Mot. to Strike Def.'s LR 56.1 Stmts.; Def.'s Mot. to Strike Pl.'s LR 56.1 Submissions.) Motions to strike are disfavored; such motions are typically denied unless they serve to expedite the work of the court. *RLJCS Enters., Inc. v. Prof'l Benefit Trust, Inc.*, 438 F. Supp.2d 903, 906-07 (N.D. Ill. 2006). The court concludes that it would not be a productive use of time to conduct a line-by-line redaction of the voluminous materials being disputed. Rather, given that the outcome of the summary judgment motion would not be affected by the inclusion or exclusion of the material at issue, the motions are stricken as moot.

Fidelity has also moved to strike an affidavit by InTrust's expert. (Mot. to Strike Hosfield Aff.) Because the inclusion or exclusion of this piece of evidence would not alter the outcome of this decision, this motion is likewise stricken as moot.

## CONCLUSION

For the reasons stated above, Fidelity's motion for summary judgment [117] is granted. The pending motions to strike portions of the Local Rule 56.1 filings or their supporting materials [134, 149, 152] are stricken as moot.

ENTER:

Dated: August 26, 2008

_____
REBECCA R. PALLMEYER
United States District Judge

---

[32]     Given that Fidelity is entitled to summary judgment against Count XI on the merits, the court need not determine whether that claim was timely filed.